BURGESS POOLE AND OTHERS, PLAINTIFFS IN ERROR v. THE LESSEE OF JOHN FLEEGER AND OTHERS.

The plaintiffs in the circuit court of West Tennessee, instituted an ejectment for a tract of land held under a Virginia military land warrant, situate south of a line called Mathews' line, and south of Walker's line, the latter being the established boundary between the states of Kentucky and Tennessee, as fixed by a compact between these states, made in 1820 ; by which compact, although the jurisdiction over the territory to the south of Walker's line was acknowledged to belong to Tennessee, the titles to lands held under Virginia military land warrants, &c., and grants from Kentucky, as far south as "Mathews' line," were declared to be confirmed ; the state of Kentucky having, before the compact, claimed the right to the soil as well as the jurisdiction over the territory, and having granted lands in the same. The compact of 1820, was confirmed by congress. The defendants in the ejectment claimed the lands under titles emanating from the state of North Carolina in 1786, 1794, 1795, before the formation of the state of Tennessee, and grants from the state of Tennessee in 1809, 1811, 1812, 1814, in which the lands claimed by the defendants were situated, according to the boundary of the state of Tennessee, declared and established at the time the state of Tennessee became one of the states of the United States. The circuit court instructed the jury, that the state of Tennessee, by sanctioning the compact, admitted in the most solemn form that the lands in dispute were not within her jurisdiction, nor within the jurisdiction of North Carolina, at the time they were granted ; and that consequently the titles are subject to the compact. Held, that the instructions of the circuit court were entirely correct.

It is a part of the general right of sovereignty, belonging to independent nations, to establish and fix the disputed boundaries between their respective limits; and the boundaries so established and fixed by compact between nations, become conclusive upon all the subjects and citizens thereof, and bind their rights; and are to be treated, to all intents and purposes, as the real boundaries. This right is expressly recognised to exist in the states of the Union, by the constitution of the United States ; and is guarded in its exercise by a single limitation or restriction only, requiring the consent of congress.

The grants under which the defendants in the circuit court claimed to hold the land were not rightfully made, because they were originally beyond the territorial boundary of North Carolina and Tennessee : this is, by necessary implication, admitted by the compact between the states of Kentucky and Tennessee.

In the ordinary course of things, on the trial of a cause, before a jury, if an objection is made and overruled as to the admission of evidence, and the party does not take any exception, he is understood to waive it. The exception need not indeed then be put in form, or written out at large and signed; but it is sufficient if it is taken, and the right reserved to put it in form, within the time prescribed by the practice or the rules of the court.

Where a will, devising lands, made in one state is registered in another state in which the lands lie, the registration has relation backwards; and it is wholly immaterial whether the same was made before or after the commencement of a suit.

[Poole v. Fleeger.]

In the state of Tennessee, the uniform practice has been, for tenants in common in ejectment, to declare in a joint demise; and to recover a part or the whole of the premises declared for, according to the evidence adduced.

IN error to the circuit court of the United States for the district of West Tennessee.

John Fleeger and others, the defendants in error, instituted an action of ejectment, in 1832, to the September term of the circuit court of the United States, for the district of West Tennessee, to recover a tract of land containing two thousand seven hundred and twenty-seven acres, lying in Montgomery county, in the state of Tennessee, and lying south of " Walker's line," the established boundary line between the state of Kentucky and the state of Tennessee, and north of a line called " Mathews' line," which is in latitude 36° 30 north; being the line which by the constitution of the state of North Carolina was declared to be the true northern boundary line of the state of Tennessee, and which is described as such by the charter of King Charles the 2d.

The original title of the plaintiffs in the circuit court, was a Virginia military warrant, No. 2,685, dated 3d of March, 1784, for six thousand acres of land, in favour of John Montgomery; and the plaintiffs read in evidence the will of Frederick Rohrer, to whom a grant from the state of Kentucky, as the assignee of John Montgomery, was issued on the 24th of February, 1796.

The will of Frederick Rohrer, made, and duly admitted to probate in Pennsylvania, of which state he was a citizen; was not registered in the state of Tennessee, until after the institution of this suit.

The plaintiffs introduced in evidence a compact made on the 2d of February, 1820, between the states of Kentucky and Tennessee; which, after reciting that those states were desirous of terminating the controversy which had so long existed between them relative to their common boundary, and the appointment of commissioners for that purpose, proceeds to declare; that the boundary and separation between the states of Kentucky and Tennessee shall be as follows :

ARTICLE 1. The line run by the Virginia commissioners, in the year 1779, 1780, commonly called "Walker's line," as the same is now reputed understood and acted upon by the said states, their respective officers and citizens, from the south-eastern corner of Kentucky, to the Tennessee river, thence with and up the said river

[Poole v. Flœeger.]

to the point where the line of Alexander and Munsell, run by them in the last year, under the authority of an act of the legislature of Kentucky, entitled "An act to run the boundary line between this state and Tennessee, west of the Tennessee river, approved February 8th, 1819," would cross said river, and thence with the said line of Alexander and Munsell, to the termination thereof, on the Mississippi river, below New Madrid.

ARTICLE 4. The claims to lands lying west of the Tennessee river, and north of Alexander and Munsell's line, derived from North Carolina or Tennessee, shall be considered null and void, and claims to lands lying south of said line, and west of Tennessee river, derived from Virginia or Kentucky, shall in like manner be considered null and void.

ARTICLE 5. All lands now vacant and unappropriated by any person or persons claiming to hold under the states of North Carolina or Tennessee, east of the Tennessee river, and north of the parallel of latitude of 36 degrees 30 minutes north, shall be the property of, and subject to the disposition of the state of Kentucky, which state may make all laws necessary and proper for disposing of and granting said lands, or any part thereof; and may by herself or officers do any acts necessary and proper for carrying the foregoing provisions of this article into effect; and any grant or grants she may make therefor shall be received in evidence in all the courts of law or equity in the state of Tennessee, and be available to the party deriving title under the same; and the land referred to in this article shall not be subject to taxation by the state of Tennessee for five years, except so far as the same may in the mean time be appropriated by individuals.

ARTICLE 6. Claims to land east of the Tennessee river, between Walker's line and the latitude of thirty-six degrees and thirty minutes north, derived from the state of Virginia in consideration of military services, shall not be prejudiced in any respect by the establishment of Walker's line, but such claims shall be considered as rightfully entered or granted; and the claimants may enter upon said lands, or assert their rights in the courts of justice, without prejudice by lapse of time, or from any statute of limitations for any period prior to the settlement of the boundary between the two states; saving, however, to the holders and occupants of conflicting claims, if any there be, the right of showing such entries or grants to be invalid, and of no effect, or that they have paramount and superior titles to the land covered by such Virginia claims.

ARTICLE 7. All private rights and interests of lands· between Walker's line from the Cumberland river, near the mouth of Oby's river, to the southeastern corner of Kentucky, at the point where the boundary line between Virginia and Kentucky intersected Walker's line on the Cumberland mountain, and the parallel of thirty-six de-grees thirty minutes north latitude, heretofore derived from Virginia, North Carolina, Kentucky, or Tennessee, shall be considered as rightfully emanating from either of those states; and the states of Kentucky and Tennessee reserve to themselves respectively the power of carrying into grant claims not yet perfected, and in case of conflicting claims, (if any there be,) the validity of each claim shall be tested by the laws of the state from which it emanated, and the contest shall be decided as if each state respectively had possessed the jurisdiction and soil, and full power and· right to authorize the location, survey, or grant, according to her own rules and regulations.

ARTICLE 8. It is agreed that the foregoing articles shall receive the most liberal construction for effecting the objects contemplated; and should any disagreement arise as to the interpretation, or in the execution thereof, two citizens of the United States, but residents of neither Kentucky or Tennessee, shall be selected, one by the execu-tive of each state, with power to choose an umpire in case of disa-greement, whose decision shall be final on all points to them sub-mitted.

ARTICLE 9. Should any further legislative acts be requisite to effectuate the foregoing articles and stipulations, the faith of the two states is hereby pledged, that they will unite in making such provi-sions, and respectively pass such laws as may be necessary to carry the same into full and complete effect.

This treaty was ratified by acts of the several legislatures of the states of Kentucky and Tennessee in 1803.

The plaintiffs also proved that the legislature of Tennessee had by several acts, recognised Mathews' line as being in the position of 36 degrees 30 minutes north, and that, according to observations made by commissioners appointed by the governor of Tennessee, Walk-er's line was about eight statute miles north of the true meridian of 36 degrees 30 minutes. They proved that the land in controversy was to the south of Walker's line, and between it and Mathews' line, and that Mathews' line was run conformably to the observations of the commissioners.

The defendants objected to the introduction of the will of Fre-

derick Rohrer, as evidence; 1st, upon the ground that the *probate* and *certificate* were not such as to authorize its registration in this state; 2d, upon the ground that said will was registered in Tennessee since the institution of this suit, and more than twelve months after the death of the testator; and therefore could only take effect from the date of registration. But these objections were overruled by the court, and the will was read to the jury by the plaintiffs, as evidence of title.

The defendants proved that all the lands in their possession lie south of Walker's line, from a half to two miles distance.

The defendants likewise objected to the evidence of title offered by the lessors of the plaintiffs, upon the ground that their title was a tenancy in common, which would not, in law, support a joint demise, and they moved to nonsuit the plaintiffs upon this ground. But their objection and motion were overruled by the court, with an intimation that the point would be considered on a motion for a new trial.

No exception to the opinion of the court in permitting the will to be read, was taken in the progress of the trial; nor was it stated that the right to do so was reserved. The practice of the court is for exceptions to be taken after trial, if deemed necessary.

The defendants read to the jury the following grants, to wit : No. 1629, from the state of North Carolina to Thomas Smith, for six hundred and forty acres, dated 27th of April, 1792. No. 1140, from the state of North Carolina to James Ross, for two hundred and seventy-four acres, dated 14th of March, 1786. No. 102, from the state of North Carolina to N. Hughes, for 316 acres, dated 7th March, 1786. A grant from the state of North Carolina to Samuel Barton, for one thousand acres, dated 9th of July, 1797. A grant from said state to Duncan Stewart, for 370 acres, dated 17th November, 1797. A grant from said state to John M'Nairy, for 274 acres, dated 6th of December, 1797.

The defendants also read the following grants from the state of Tennessee, to wit: No. 913 to John Shelby, for 320 acres, dated 6th of March, 1809; another grant from the state of Tennessee to John Shelby, for 100 acres, dated 8th March, 1814; a grant from the state of Tennessee to Robert Nelson, for 300 acres, dated 17th April, 1811; a grant from Tennessee to William E. Williams, for 80 acres, dated 6th November, 1812.

The defendants then read to the jury regular conveyances, deducing the title to themselves from the different grantees above men-

tioned, and proved that said grants covered their possessions respectively; except that each of the defendants whom the jury found guilty of the trespass and ejectment, in the declaration mentioned, were in possession of portions of land not covered by any grant older in date than the grant from the state of Kentucky to Frederick Rohrer, under which the lessors of the plaintiffs claim.

The defendants also proved that the different grantees abovementioned, under whom they claim, took possession of the different tracts of land contained in the grants by them read, on or about the dates of said grants; and that they, and those deriving title under them, have continued in possession of the same ever since, claiming the lands as their own.

The defendants then read to the jury the statute of Virginia, passed on the 7th of December, 1791, ch. 55, recognising and confirming Walker's line, as the boundary between that state and North Carolina. Also the act of Virginia, passed on the 18th of December, 1789, ch. 53, s. 14, 15, proposing to erect the district of Kentucky into an independent state. Also the act of congress, passed on the 4th of February, 1791, ch. 78, s. 1, 2, assenting to the erection of the said district of Kentucky into an independent state, at a certain future time, and upon certain conditions. Also the compact between the states of Tennessee and North Carolina.

The defendants then proved that the states of North Carolina and Tennessee had claimed up to Walker's line as the true line of boundary between those states and the states of Virginia and Kentucky; from the time at which it was run, up to the time of the treaty between Tennessee and Kentucky, made for the settlement thereof in 1820.

The defendants also proved that the county lines of Tennessee were Walker's line on the north. That in her legislative, judicial, and military capacity, Tennessee always claimed possession, and acted up to said line as the northern boundary of the state. That the process of her courts ran up to said line, and were executed up to it. That all criminal acts committed to the south of said line, and north of the southern boundary of Tennessee, were tried and punished in the state of Tennessee, and not in the state of Kentucky; and instances were proved where persons put upon trial in Kentucky for criminal offences, had been acquitted, upon the sole ground that the offences were committed on the south side of Walker's line. That the inhabitants south of said line all paid taxes in the state of

Tennessee, and not in the state of Kentucky. That they were always enrolled as militia of the state of Tennessee, and mustered as such, up to said line. That they always voted at elections in Tennessee as citizens thereof, and not in Kentucky. That in fact, the state of Tennessee was in full and entire possession of all the lands lying to the south of said line, at and before the emanation of the grant to Frederick Rohrer, under which the lessors of the plaintiffs claim title, and from the time of the earliest settlements that were made in that part of the country, which took place long before the dates of the titles under which either of the parties claim. The defendants also proved, that the state of Kentucky, so far as regards the establishment of her county lines, the service of her militia, the payment and collection of taxes, the regulation of her judicial process, and of the right to vote at elections, conformed to Walker's line, as her southern boundary. The defendants also gave in evidence the observations made by Jefferson and Fry, and by Walker and Henderson, and those associated with them; and also proved that the latitude of Walker's line had, since the running thereof, been taken by Genl. Daniel Smith, a man of science, and who was along with Walker at the running of his line, and that the latter observation of Genl. Smith found Walker's line to be about in latitude thirty-six degrees thirty minutes. Defendants also proved that some years since the latitude had been taken by a scientific gentleman, and from the result of his observation, Walker's line was two or three miles too far south. It also appeared in evidence, that Merewether Lewis, on his return from the expedition to the mouth of Columbia river, had taken an observation somewhere on Cumberland mountain, and that after taking it, he had written a letter to some person in Kentucky, giving it as his opinion that Walker's line was too far north; and that after the reception of said letter there was much talk in the state of Kentucky about claiming to the true latitude of thirty-six degrees and a half; but it did not appear that any definitive public act of the state of Kentucky had been done in consequence of the reception of the information aforesaid, from Merewether Lewis; or that, so far as Walker's line extended west, the relative possessions and claims of the two states had been interfered with in any way. But it did appear, that about the year 1819, shortly after the treaty with the Chickasaw tribe of Indians, by which the lands lying in Kentucky and Tennessee, between the Mississippi and Tennessee rivers, were acquired, Kentucky sent two commissioners, Alexander

and Munsell, to begin at a point on the Mississippi river, exactly in the latitude of thirty-six degrees and a half, and to run a line from thence east, to where the same would intersect the Tennessee river; and that said commissioners reported to Kentucky that they did so begin, and so run a line, and that the point where it would have crossed the Tennessee river, was about eleven miles to the south of where Walker's line reached said river, on the east side thereof. Walker's line never was extended further west than Tennessee river.

· The court instructed the jury, that, as by the compact between Kentucky and Tennessee the boundary line of thirty-six degrees and thirty minutes north, was fixed several miles south of Walker's line, and of the land in controversy; the titles of the defendants were subject to the compact, and could only be sustained under it. That the state of Tennessee, by sanctioning the compact, admitted, in the most solemn form, that the lands in dispute were not within her jurisdiction, nor within the jurisdiction of North Carolina, at the time they were granted; and that, consequently, the titles are subject to the condition of the compact.

After the verdict of the jury, the defendants moved the court to grant them a new trial, which motion was overruled by the court.

The verdict of the jury was in favour of the plaintiffs, on which the circuit court entered judgment. To the instructions given by the court to the jury, on the several interlocutory questions raised on the trial, and in overruling the motion for a new trial, the defendants excepted; and tendered a bill of exceptions, which was signed by the court.

The defendants prosecuted this writ of error.

A printed argument was submitted to the court by Mr. Washington, for the plaintiffs in error; and the case was argued at the bar for the defendants in error, by Mr. Catron, who also submitted a printed argument, prepared by Mr. Yerger and Mr. Forester, the counsel for the plaintiffs in the circuit court.

The argument of Mr. Washington, for the plaintiffs in error, stated, that the locality of the land in controversy is not disputed; it lies south of Walker's line: neither is the latitude of that line, it being thirty-six degrees and an half. It has been ascertained that Walker's line was run south of the true meridian, thereby taking

[Poble v. Fleegor.]

from Virginia a portion of territory which properly belonged to her; and to the same extent increasing the territory of North Carolina.

The principal question in the case, is, whether Walker's line, although made correctly or not, did not become the boundary between Virginia and North Carolina; and if it did, whether the latter state had not, at the time of the inception of the title of the plaintiffs in error, such a property to the land in controversy as was capable of transmission by the grants under which the plaintiffs in error claim. This is contended for on the part of the plaintiffs, and also that this right continued down to 1820, except so far as North Carolina or Tennessee had transferred the property to individuals. The treaty of boundary was made in 1820, between Kentucky and Tennessee; and so far as the prior boundary of Walker's line was altered or affected thereby, Tennessee might part with her dominion over this territory; but not with property in it, previously transferred by North Carolina or herself, for a full and valuable consideration, and to which titles in full form had been given.

1. Walker's line, after the demarcation, became the boundary between Virginia and North Carolina, by express and positive enactment by the former state. Act of the legislature of Virginia of December, 1791; 1 Laws of Vir. 75, ch. 55.

2. On the 7th day of December, 1791, the date of the passage of said act of assembly, Virginia still retained the sovereignty in what is now Kentucky, and had a right to dispose of the soil within that part of her chartered limits, or agree as to the limits with an adjoining state.

On the 18th of December, 1789, 1 Laws of Virginia, ch. 53, page 72, Virginia passed a law authorizing the district of Kentucky to elect members to a convention to form a state government; and authorizing her to become an independent state, with the consent of the congress of the United States; and on the 1st of June, 1792, Kentucky became, by a law of the United States, a state of the Union.

The law fixing definitely Walker's line as the boundary between Virginia and North Carolina, and which when Kentucky became a state, was her southern line, was thus established while Kentucky was a part of Virginia.

The fact, that at the time of the adoption of Walker's line by Virginia as a boundary, what is now the state of Tennessee was no part of the dominion of North Carolina, but was the territory of the

[Poole v. Fleeger.]

United States south of the Ohio, makes no difference in the case. Virginia fixed her own boundary when it was competent for her to do it, without consultation with, or the concurrence of the adjoining claimant, whoever it might be; provided she did not encroach upon territory not her own; and this is admitted.

3d. Without any legislative enactment of Virginia, adopting Walker's line, that must be considered the boundary between Kentucky and Tennessee; in virtue of the principles of usucaption and prescription.

The record in this case abundantly shows, that from the time at which Walker's line was run, it was mutually recognised by Virginia and North Carolina; and, subsequently, by Kentucky and Tennessee, as the boundary between them. That the counties in those states were laid off on each side of the line, those in Kentucky, calling for it as the southern boundary, and those in North Carolina, as the northern boundary. That the territory on each side of the line was actually possessed by those states respectively, according to the above designation of county limits. That exclusive jurisdiction was claimed and exercised by Virginia and Kentucky on the northern side, and by North Carolina and Tennessee on the southern; and that the jurisdictions so claimed and exercised, were mutually conceded and acquiesced in. That both states, not only in the appropriation of territory, but in the settlement of inhabitants, the reputation of their citizenship, the organization of their militia, the voting at the elections, the collection of taxes, and the administration of their laws, generally; had reference to this line as a common boundary. It is true that some claims to land situated on the south of this line, and derived under the state of Virginia do exist; but they are comparatively few, and without a single exception, originated either before the line was marked, or its position had become notorious. A decisive proof that many more private titles to land lying between this line and the true meridian of thirty-six degrees and a half, emanated from North Carolina, than did from Virginia, is to be found in the fact, that by the treaty of 1820, said line was finally established, notwithstanding it was then admitted, on all hands, to have been placed in the first instance too far north; and that Tennessee was suffered to retain dominion over the space in question; and that the claims of individuals holding under her and North Carolina were sanctioned, except so far as they conflicted with older ones derived under Virginia and Kentucky, and that too for a very inconsiderable

[Poole v. Fleeger.]

equivalent. Now, why were these provisions contained in the treaty? For no other reason, it is believed, than because almost the whole of this territory had been appropriated by North Carolina and Tennessee; and the citizens of the latter state, had a deep interest that things should remain in statu quo, and the state itself was under obligations to maintain their rights which had been thus acquired. And for corresponding reasons, the state of Kentucky must have been willing to renounce a claim which had no legal foundation for its support; especially, when her engagements to her own citizens were not much concerned in the matter; and when, at the same time, she was providing security for the most of them against the adverse titles derived from another sovereignty.

The counsel for the plaintiffs in error also contended that the possession of the lands south of Walker's line, had continued so long in North Carolina and Tennessee, as to amount to a prescription.

Between nations there is no specific period during which possession of disputed territory must have remained with one of them, to constitute a title by prescription; because as between such claimants there is no supreme power to dictate to them a positive rule of action. But the principle applicable to such a case, which is derived from the law of nations, is, that possession must have endured long enough to evince a distinct acquiescence on the part of the adverse claimant in the rightfulness of the possession; and, what length of possession is necessary for that purpose, must, of course, depend upon the peculiar circumstances of each case. To give to possession such an effect, it is requisite also, that it should have been held with the knowledge of the adverse claimant; for the fact of possession operates against the party which seeks to disturb it as presumptive evidence of abandonment; and it furnishes to the party holding it proof of the same description, and of equal force, in favour of the existence of the right. In this case the possession of North Carolina may be coupled with that of Tennessee, or considered as one continuing possession, on account of the relation which those states sustain towards each other; and, for the same reason, the acts of Virginia and Kentucky are to be viewed as identical.

It was contended that this possession, and the constant assertion by North Carolina and Tennessee, of title to the territory left out by Walker's line, was well known to Virginia, and was acquiesced in by her. This possession commenced, and the acquiescence of Vir-

ginia in it, before the title under which the defendant in error claims, accrued. The argument contained a reference to written testimony and to legislative enactments by Virginia; as well as to evidence of her frequent recognition of the possession and disposition of this territory by the executivè of that state, after the running of Walker's line.

It is a principle of municipal law, perfectly well established, that possession of land for a great length of time, and non claim, will give a good title; and that, in support of such a title, almost any thing may be presumed; such as an act of parliament, a grant from the crown, a deed of conveyance, the extinction of an outstanding opposing title, &c. Chalmer v. Bradley, and Gibson v. Clark, 1 Jacob and Walker, 63, note 2, 161; Jackson v. Hudson, 3 Johnson's Chan. Rep. 375; Powell v. Millbanke, Cooper, 102, 3; 10 Johnson, 380; 3 Johnson's Cases, 118; 3 Connecticut Rep. 630; 11 East, 280; 10 East, 488. This principle also pervades the public law, and is not affected in its operation by the doctrine of *nullum tempus occurrit regi;* because, whenever it is brought to bear upon questions of public law, both parties are sovereigns, and stand in the same relation to each other as individuals do in ordinary cases.

4th. The treaty of 1820, made between Kentucky and Tennessee, does not affect the title of the plaintiffs in error.

It has been shown, in the views already taken of this subject, that North Carolina and Tennessee acquired a complete title, including both sovereignty and property to all the lands on the south side of Walker's line. If so, they were competent to transmit property in any portion of those lands, to the plaintiffs in error; and that they did so, according to all legal formality, and that for a full and valuable consideration, is shown in the record by the production of their grants. Then, the plaintiffs in error being once invested with title to the property in dispute, what has divested them? It is said, that the treaty of 1820 has had the effect: not by a direct process of divestiture, but by the admission of Tennessee, therein made, that the land, when it was granted did not lie within her jurisdiction, nor within that of North Carolina. But how was the fact, notwithstanding that admission? It was, that the land did lie within the jurisdiction of North Carolina and Tennessee, at the time referred to. Then, the question is presented, whether it be competent for a state, by admission or otherwise, to divest a title already conferred upon one of its citizens? For, change the aspect of it as you will, it is

still a question as to the power to divest, assuming, that the land was not within the jurisdiction of North Carolina and Tennessee; and their grant would be void for want of property in the subject-matter of the grant. But proving, as the plaintiffs in error have done, and surely they stand in a situation to be permitted to make the proof, that the land did belong to the grantor at the time that they became grantees of it; and then the admission of the state to the contrary becomes of no avail. It is a principle of law, that when one claims title under another, he will not be permitted to deny the title of him under whom he claims. But the reverse of that principle is by no means true; that is, where the grantor, after having made and delivered a grant, acknowledges that he had no title at the time of making it; his grantee is not bound by that acknowledgment. So far is it from being true, that, if the grantor had not, in reality, any title when he conveyed, but afterwards acquires one, it vests, *eo instanti* by relation to the date of the grant, in the grantee; and this, too, by operation of law; so that the grantor could not, if he would, afterwards defeat his own sale. How is it possible then, for a posterior admission of the state of Tennessee to take away from the plaintiffs in error rights which they undoubtedly had before that admission was made?

It is likewise a principle of law, founded in abstract justice and morality, and highly promotive of good faith, that a party is estopped from denying his own deed: And the doctrine of estoppel does not apply to the execution of the deed simply, for, its being the deed of the party, necessarily implies its execution; but it applies to the operation and effect of it, so that the grantor is bound by all legal inferences and consequences resulting from it. Now, to say that it lies in the mouth of the grantor, to deny that there was any subject-matter for the grant to act upon, appears to be as effectual a mode of destroying it, and of absolving him from the obligation of it, as any that could be devised. And why should not this principle be enforced against a state? When a state makes a grant to an individual, it is a contract, with all the incidents of any other contract of the same kind attached to it; and in the making of which, the state exerts only the same capacities that an individual would do in a like case; and it must, therefore, be governed by the same rules, regulations, and restrictions, in every respect.

When Tennessee and Kentucky entered into the compact of 1820, it was competent for the former to part with what she had, and no

more. She then possessed sovereignty over the land which is the subject of this suit, but no property in it; that belonged to the plaintiffs in error. She might, therefore, have parted with her sovereignty over the land, and have transferred the allegiance of the owners of it to the state of Kentucky; in which case, their right of property would have remained unaffected. But precisely the reverse of this is what, by the compact, she purports to have done; this is, to retain the sovereignty, and cede the property; or, what amounts to the same thing, to give such an effect to a certain state of fact, as will enable the defendants in error successfully to hold the property against those in whom the title before existed; when, without such an effect, thus communicated, those facts would have been wholly inefficient for the purpose.

Now, is the doctrine to receive judicial sanction that a state, although she may be sovereign, can thus tamper with the rights of individuals? In one sense, sovereign power may be competent to do any thing; to destroy all the creations that have taken place under the exercise of it; and that, too, without any regard to the consequences of such wantonness. But under our constitution and laws, there is some restraint imposed upon the exercise of the power of the state: the functions of all public bodies, and public officers, are limited and defined; and no interference can take place with private property that is inconsistent with right, and unwarranted by known rules and regulations. The legislature of Tennessee, in appointing commissioners to make this compact, and in the subsequent ratification of it, and the commissioners themselves in making it, all acted by virtue of a delegated power; and no power was delegated to them, or could be, that was incompatible with the charter whence that power was derived. The 20th section of the declaration of rights, which is a part of the constitution of Tennessee, says: "that no retrospective law, or law impairing the obligation of contracts, shall be made." Now, here is an express limitation upon the power of the legislature. Has it been observed in the making of this compact? What is meant by a retrospective law? It is one which changes, or injuriously affects a present right; by going behind it, and giving efficacy to anterior circumstances to defeat it, which they had not when the right accrued. This compact looks back to the dates of the warrant and grant issued by Virginia and Kentucky, both powerless as emanating from those states; overleaps the intervening title derived from Tennessee and North Carolina, which was

[Poole v Fleeger.]

good if it had been let alone; and, by the new life which it breathes into the worthless claim, subverts the other. And what is meant by the obligation of a contract, in the sense of the constitution? As applied to this case, we shall best see by inquiring what was the state of the contract upon which the plaintiffs in error rely, without the provisions of the compact; and what it is with them. Setting aside the compact, and there is a grant; which is the highest muniment of title, and which binds the state to defend the possessor in the enjoyment of the land. But taking the compact into consideration, and giving force to it according to its terms, and you destroy the grant, and take away from the holder all the consequences flowing from it; thus most emphatically impairing the obligation which it had created. The passage of such a law would even exceed the competency of the British parliament, notwithstanding its attribute of omnipotence; and the judges there would not fail to pronounce it void, as being in violation of natural justice and inherent right. 18 Johnson, 138; 7 Johnson, 497; 2 Dallas, 308, 311.

The sixth article of the compact of 1820, under which this suit was brought by the defendants in error, is in the following words: " claims to land east of the Tennessee river, between Walker's line, and the latitude of thirty-six degrees, thirty minutes, north, derived from the state of Virginia in consideration of military services, shall not be prejudiced in any respect by the establishment of Walker's line; but such claims shall be considered as rightfully entered or granted; and the claimants may enter upon said lands, or assert their rights in the courts of justice, without prejudice by lapse of time, or from any statute of limitations, for any period prior to the settlement of the boundary between the two states; saving, however, to the holders and occupants of conflicting claims, if any there be, the right of showing such entries or grants to be invalid, and of no effect; or that they have paramount and superior titles to the land covered by such Virginia claims."

It has already been shown, in the preceding views exhibited of this case, that, by the establishment of Walker's line in the first instance, Virginia distinctly admitted that the land to the south of it was not within her jurisdiction, and did not belong to her; and that North Carolina, by the possession of that land, acquired a complete title to it. The title thus acquired by North Carolina, would certainly inure to the benefit of the plaintiffs in error, so far as any of that land was granted to them. Then, by the above article of the

compact, Tennessee renounced that title; which renunciation, as applied to this case, did not in the least affect the interest of the state, but only operated to destroy the right vested in her grantees. The article goes further, and says, that the claims under Virginia shall be considered as rightfully entered or granted; and shall not be prejudiced by lapse of time, or any statute of limitations. In this respect, the compact professed to act directly upon the rights of individuals, situated as the parties to this suit are; giving to the one, a title which he had not before, and taking away from the other that which he had—tying up the hands of one, and furnishing the other with a most deadly offensive weapon. By the provisions thus interposed, lapse of time, presumption, and the statute of limitations, are all cut off, as sources from which title might have been acquired; and, in fact, was acquired. If there is any question perfectly well settled in the courts of Tennessee, so that no one now thinks of meeting it again, it is, that our statutes of limitation as appl ed to land, have a double operation—that is, that they bar the remedy of the plaintiff in ejectment, and give to the defendant, although his paper title was utterly void, a title good against the whole world, by positive prescription. Act of 1715, ch. 27, sec. 2; Act of 1797, ch. 43, sec. 4; Act of 1819, ch. 28, sec. 21; Porter's Lessee v. Cocke, Peck's Rep. 47; Ferguson v. Kennedy, Peck 321; 3 Johnson's Chan. Rep. 142, 3; 10 Mad. 206. It appears, therefore, that the sixth article in the compact cannot be sustained, without its operating as a repeal of those statutes, a reversal of those decisions, and a direct judicial sentence.

5th. The title under which the defendants in error claim is void for champerty.

That title is the grant from the state of Kentucky, operating *proprio vigore;* or it is the above article in the compact; or it is both taken together. Now, considering it either way, there was an adverse possession by the state of Tennessee, or by those claiming under it, at the time of the origin of the title of the defendants in error; and the provisions of the statute of 32 Henry 8th, ch. 9, operate upon the conveyance thus attempted to be made, and render it absolutely void. Williams v. Jackson, 5 Johnson, 498; Co. Lit. 214, s. 347.

6th. The lessors of the plaintiffs in the court below, have shown a title which makes them tenants in common, only; and there is but

[Poole v. Fleeger.]

one demise in the declaration, and that a joint one. Tenants in common cannot support ejectment upon a joint demise.

Although the action of ejectment is fictitious, yet such a demise must be laid as would, if actually made, have transferred the right of possession to the lessor. · Ejectment is a possessory action, and each tenant in common is not capable of demising the whole premises; and, therefore, a case is not made out upon the face of the declaration which entitles the lessor to bring suit. Adams on Ejectment, 186; ·Treport's case, 6 Coke, 15 (6).

It is due, however, to the circuit judge who tried this cause, to state, that this defect in the declaration, if it be one, was not discovered until after the trial was gone into: and that, although he overruled the motion for a nonsuit, founded on it; he intimated, that he would reserve the point for further consideration, upon an application for a new trial, if one should be made. And that none but a formal application for a new trial was made, on account of circumstances known to the circuit judge, which caused the sudden and unexpected adjournment of the court.

7th. The will of Frederick Rohrer, under which the defendants in error claim, ought not to have been received in evidence. 1st. On account of the insufficiency of the certificate and probate, to authorize its registration in the state. 2d. Upon the ground that said will was registered in Tennessee, after the institution of this suit; and therefore could only take effect from the date of registration.

The will of Frederick Rohrer was a foreign one, that·is, made and published in Pennsylvania; and what purported to be a copy only, was produced upon the trial of this cause. It is perfectly clear that no will made out of the state of Tennessee, can pass lands situated in it, and that no evidence of a will can be received in the courts there, for the purpose of affecting titles to land; but in strict conformity to the laws of Tennessee, Kerr v. Moore, 9 Wheat. 571. The probate of the will, and the registration, are all in the record, and the Court is respectfully requested to examine them. They will compare them with the provisions of the act of the legislature of· Tennessee on the subject. It will be observed, that the act of 1823, ch. 31, authorizes copies of such wills to be recorded in the county where the land lies, provided they shall have been proved according to the law then (1823) in force in the state, as to wills made and executed within the limits of the state: Act of the 1st session of

[Poole v. Fleeger.]

1784, ch. 22; Act of 2d session of 1784, ch. 10. And when so re-corded, shall have the same force and effect as if the original had been executed in this state, and proved and allowed in our courts; and shall be sufficient to pass lands and other estate.

Whether a copy of this will was duly proved and recorded in Tennessee or not, it was not recorded until after the commencement of the suit; and there is no principle better understood, or more universally admitted, than that in ejectment the lessor of the plaintiff must have a title to the premises in dispute at the laying of the demise. And, according to the construction of the above statute of 1823, the title to land here does not pass by such a will, until a copy thereof is actually recorded, in the manner therein prescribed; nor then, unless the probate is in due form, and the will itself shall have been executed with the solemnities required.

Mr. Catron, for the defendants in error.

By mutual legislation and arrangement between the states of Virginia and North Carolina, commissioners were appointed as early as the year 1779, two from each state; who met in September of that year, for the purpose of extending the common boundary of the states on parallel of latitude 36 degrees 30 minutes north.

The line, in part, had been previously run by Fry and Jefferson; beginning at the Currituck inlet, and extending west 329 miles to Steep-rock creek near New-river, and at 81 degrees 12 minutes west longitude from London. Haywood's History of Tennessee, 473.

The commissioners on the part of Virginia were, Doctor Thomas Walker and Daniel Smith; and those acting in behalf of North Carolina, Colonel Henderson and William B. Smith. The commissioners by mutual observations ascertained the precise latitude of 36 degrees 30 minutes north, being one mile 201½ poles due south of the termination of Fry and Jefferson's line; and there fixed their beginning. After running the line as far as Carter's valley, forty-five miles west of Steep-rock creek, the Carolina gentlemen conceived the line was further south than it ought to be; and on trial, it was found the variation of the needle had slightly altered. On making observations, it was supposed the line at that point was more than two miles too far south—one of the Virginia commissioners concurring that this was the fact. The distance was measured off due north, and the line run eastward from that place by the Carolina commissioners to Steep-rock creek, aided by one of those from Virginia, (Mr.

Smith,) for about twenty miles east; when he became satisfied from repeated observations, that the second line was wrong and the first right; to this conclusion the Carolina gentlemen refused their assent. Doctor Walker had continued to extend the line west, but was soon overtaken by Mr. Smith. Concurring that the first line was on the true latitude, they accordingly brought it up from Carter's valley, and extended it to the westward, separate from the Carolina commissioners, who did not again act in concert with them, but extended the second line as far as Cumberland mountain, protesting against the line run by the Virginia commissioners; and there they ceased the work and returned home. East of Cumberland mountain the southern line was afterwards known as Walker's line, and the northern as Henderson's line—being something more than two miles apart, and extending from Steep-rock creek to Cumberland mountain.

The Virginia commissioners from Cumberland-gap, where they struck the mountain, continued the extension of the line run by them west, through the mountain, and marked it as far as Deerfork, 124 miles from the beginning at Steep-rock creek. They there left off running the line, and went west to Cumberland river, about 109 miles from Deer-fork; ascertained the true latitude of 36 degrees 30 minutes, as they supposed, and from that point run and marked the line west, (crossing the Cumberland river again at 131 miles,) to the Tennessee river, 41 miles from the first crossing of the Cumberland. Their authority extended no further; but on their way home orders met them from the governor of Virginia to proceed to the river Mississippi, and there ascertain and mark the termination of the line; which service they performed. The line from Cumberland to Tennessee river is known as Walker's line; and where it strikes the Tennessee is over eleven miles north of 36 degrees 30 minutes, but much less north, where it was commenced at Cumberland river. This circumstance produced the present controversy; to understand which, it has been deemed necessary to give, in something of detail, the history of Walker's line, and why it was not recognised as the true boundary between Kentucky and Tennessee; and the necessity of the compact of 1820, to settle the boundary between the two states.

The constitution of North Carolina declares the northern boundary of that state to be thirty-six degrees, thirty minutes, sec. 25.

It is attempted to be changed by Walker's line, run in 1779, '80; and the Virginia act of assembly of the 7th of December, 1791, ch.

55. The line had been marked west from Cumberland river to the Tennessee river by Walker. In December, 1789, a committee of the house of commons of North Carolina, to whom was referred the letter of the governor of Virginia, reported favourably to the establishment of Walker's line, but the senate did not act. At the next session, 11th December, 1790, a committee of the house again reported, and recommended a law to be passed confirming Walker's line as the boundary between Virginia and North Carolina, reserving the right of the oldest grants or entries made by either state. The report was concurred with by both houses; Hayw. His. Ten. 484.

To meet the report Virginia took the first step, and on the 7th of December, 1791, passed an act conformably to it. Id. 485. But North Carolina passed no law upon the subject; for the well known reason that, in February, 1790, she had ceded the western part of the state to the United States; which government, (not North Carolina,) had the sole power to fix the boundary with Virginia, from the north-west corner of North Carolina to Cumberland gap. See Session Act. Hayw. H. 434. In 1796, Tennessee became a state; and of course recognised no act of North Carolina after the cession of the United States. Hayw. H. 8.

Nor did Kentucky recognise the legislation of Virginia west of Cumberland gap after the 18th of December, 1789. Then an act was passed authorizing the district of Kentucky to call a convention for the purpose of separating from Virginia, the assent of congress being had. The convention was called, a separation determined upon; and the act of congress of the 4th of February, 1791, ch. 78, was passed, receiving Kentucky, according to its actual boundaries, on the 18th day of December, 1789; Kentucky to come in as a state on the 1st of June, 1792. On the 2d of April, 1792, Kentucky formed her first constitution, and thereby declared the compact with Virginia a part thereof; Art. 8, sec. 7, 1 Marshall's Hist. Kentucky, 408. Virginia is concluded by it; Green v. Biddle, 8 Wheat. 1. The act of congress of the 4th of February, 1791, settled the southern boundary of Kentucky at thirty-six degrees thirty minutes, and Virginia had no power to change it afterwards: her act of the 7th of December, 1791, is, therefore, of no validity in this controversy.

But it never was intended to have any force. North Carolina adopted a report, (having no legal force,) proposing a joint law to Virginia. So far as the latter had power, she passed the law, but North Carolina did not meet it; the object was a compact by mutual

[Poole v. Fleeger.]

legislation. Is it not most harsh to say, Virginia shall be bound by her act to confirm the North Carolina claims; to surrender territory equal to four counties, and North Carolina shall not be bound?

The act of Virginia, in its terms only, extends to the common boundary between North Carolina and Virginia, as run by Walker. The line was begun at Steep-rock creek, forty-five miles east of Carter's valley, and east of the north-west corner of Tennessee. From Steep-rock creek to the north-west corner of North Carolina, was the only part of the boundary between North Carolina and Virginia. to which the act of December, 1791, did or could apply, because west of this North Carolina had no jurisdiction. And so Virginia understood the law, as is manifest from her compact of 1801, ch. 29, 1 Scott, 716, 1803, ch. 58; by which commissioners from the respective states settled and marked a new boundary, equidistant between Walker's and Henderson's line, from Cumberland-gap east, to the north-west corner of North Carolina.

That either Tennessee or Kentucky ever imagined that the acts of Virginia or North Carolina had affected the common boundary of the states, cannot be pretended; the reverse is prominently manifest from Tennessee acts of 1801, ch. 29; 1803, ch. 63, 1812, ch. 61; 1815, ch. 192; 1817, ch. 157; 1819, ch. 89; and 1820, ch. 20. In fact, and by universal admission on the part of Tennessee and Kentucky, the act of Virginia never affected the question presented by the record. Conceding to the act the validity claimed for it, and suppose North Carolina had met it by a corresponding statute, still it could have no binding effect. The constitutions of Virginia and North Carolina conferred jurisdiction to thirty-six degrees, thirty minutes. Could the states by legislation or by compact fix the boundary ten miles further north? Would such act give North Carolina jurisdiction over the constitution? That the legislature of North Carolina had no power to authorize grants north of thirty-six degrees thirty minutes, must be admitted: her grants are clearly void. But then it is contended the act of Virginia of December, 1791, prescribed Walker's line as the southern limit of the district in Kentucky, where Virginia military warrants could be located; and the plaintiff's grant being south of the line, it is also void: therefore, both titles being void, the plaintiff must fail.

The sixth article of the compact confirms the military grants of Virginia, south of the line and north of thirty-six and a half degrees. The compact is just as good and effectual a grant as an ordinary patent.

North Carolina granted 25,000 to Genl. Green, and 200 acres to the town of Nashville, by statute; and each of which grants have received the judicial sanction. So Tennessee confirmed the military grants made north and east of the military boundary, by her act of 1815. Ch. 173, and in various other cases.

The compact is the supreme law, by the act of congress adopting it, of 12th of May, 1830. Ingersoll's Digest, 695; Con. U. S. ar. 6, sec. 2. But for the confirmation, the jurisdiction of Tennessee could not extend beyond 36 degrees 30 minutes north; because the *legislature* could not alter boundary fixed by the constitution. Congress had made it the supreme law over the constitution of Tennessee.

And in this connection it may be remarked, that all legislation on the part of Virginia and North Carolina, tending to change the boundary from 36 degrees 30 minutes, to 36 degrees 40 minutes, would have been obnoxious to the 1st art. 10th sec. of the constitution of the United States, which declares: " No state, shall, without the consent of congress, enter into any agreement or compact with another state." The prohibition must comprehend compacts of cession from one state to another; if not, Pennsylvania may treat for half of Delaware, and still leave her with two senators, and one representative in congress; and the ceded half be represented as part of Pennsylvania.

Our disputed boundary presents an ample illustration of the necessity that the assent of congress should be had. By our act of 1801, ch. 29, we ordered commissioners to be appointed to treat for all the country south of Green river, including now about twenty-five counties in Kentucky. By the compact of 1820, Tennessee acquired nearly half a million of acres north of 36 degrees 30 minutes; if she could go ten miles north, she might two hundred, and purchase out a sister state, sapping the foundations of the Union.

But suppose the Tennessee and North Carolina grants the better title, yet it becomes necessary to cede them to Kentucky, as part consideration of the compromise; we, says Kentucky, will give you the sovereignty to Walker's line, in consideration of which you shall give us the right of soil; and it was agreed. Is this not taking private property for public use? 3 Story's Com. 601; 2 Kent's, 339, 2d edition. By the treaties of 1817, 1819, the sovereignty of the Cherokee country was ceded to the United States, with the right of soil, and certain Cherokee occupants had granted to them a mile square each, as a part consideration. One of these reserves covered

[Poole v. Fleeger.]

a grant made to Stuart, in 1800, by North Carolina. It was holden, per Haywood, judge, and not denied by any, that the private property of Stuart's assignee could be ceded to the Indian. 2 Yerg. R. 164, 5, 6; and congress paid Stuart's assignees for the land. Cornet v. Winton.

The provision of the constitution of the United States, that private property shall not be taken for public use, without just compensation, applies, exclusively, to a taking by the United States government, and has no reference to the acts of the states. To be bound, they must be named, as that no state shall pass any ex post facto law, or laws impairing the obligation of contracts. Barron v. The Mayor of Baltimore, 7 Peters, 243.

The constitution of Tennessee, (Bill of Rights XXI) declares, "No man's property shall be taken, or applied to public use, without the consent of his representatives; or without just compensation being made therefor."

1. By consent of his representatives, means by a law of the land, as where roads are located on private property, and no compensation is made.

2. In time of war, when the militia are called out, fuel, forage, provisions, boats, &c. may be taken, without any law, positively authorizing of it. Then compensation must be made.

Mr. Justice STORY delivered the opinion of the Court.

This is the case of a writ of error to the judgment of the circuit court of the United States for the district of West Tennessee. The original writ was an ejectment; brought by Fleeger and others, (th now defendants in error,) against Poole and others, (the now plaintiffs in error,) to recover a tract of land containing 2,727 acres in Montgomery county, in Tennessee, lying south of Walker's line, so called; which constitutes the present boundary line between the states of Kentucky and Tennessee; and north of Mathew's line, so called, which is exactly now in latitude 36° 30′ north; which by the constitution of North Carolina, is declared to be the true northern boundary line of the state, and is so described in the charter of King Charles the 2d.

At the trial, the original plaintiffs proved their title to be as devisees of one Frederick Rohrer, who claimed it by a grant of the state of Kentucky, dated the 24th of February, 1796, in part satisfaction of a Virginia military land warrant, held by Rohrer as as-

signee of one John Montgomery.  They also read, in evidence, the compact between the states of Kentucky and Tennessee, of the second of February, 1820.  The defendants claimed title under certain grants from the state of North Carolina of various tracts comprehending the premises in question, dated in 1786, 1792, and 1797; and also under certain grants from the state of Tennessee in 1809, 1811, 1812 and 1814, from which they deduced a regular title to themselves; and they proved that the same grants covered their possessions respectively, except that each of the defendants, whom the jury at the trial found guilty of the ejectment, were in possession of portions of land not covered by any grant, older in date than that to Rohrer.  The defendants also proved that the different grantees under whom they claimed, took possession of the different tracts of land contained in their grant, on or about the date thereof; and that they and those deriving title under them, have continued in the possession of the same ever since.

Various other evidence was introduced by the defendants, the object of which was to establish that Walker's line had been for a long time acted upon as the boundary line between North Carolina and Virginia, before the separation of Kentucky and Tennessee therefrom; and that after that separation Tennessee had continued to exercise exclusive jurisdiction up to that line, with the acquiescence of Kentucky, until the compact of 1820.  As our judgment turns upon considerations distinct from the nature and effect of that evidence, it does not seem necessary to repeat it on the present occasion.

By the compact of 1820, between Kentucky and Tennessee, (art. 1,) it was agreed that Walker's line (which was run in 1780) should be the boundary line between those states; and by the sixth article it was further agreed that " claims to land east of Tennessee river, between Walker's line and the latitude of 36° 30' north, derived from the state of Virginia, in consideration of military services, shall not be prejudiced in any respect, by the establishment of Walker's line; but such claims shall be considered as rightfully entered or granted; and the claimants may enter upon said lands, or assert their rights in the courts of justice without prejudice by lapse of time, or from any statute of limitations for any period prior to the settlement of the boundary between the two states; saving, however, to the holders and occupants of conflicting claims, if any there be, the right of showing such entries or grants to be invalid, and of no effect; or that they have paramount and superior titles to the land covered by such

[Poole v. Fleeger.]

Virginia claims." By another article (the 4th) it was further agreed that, " all lands now vacant and unappropriated by any person, claiming to hold under the states of North Carolina or Tennessee, east of the Tennessee river, and north of the parallel of latitude of 36 degrees 30 minutes north; shall be the property of and subject to the disposition of the state of Kentucky."

Upon the whole evidence in the cause, the court instructed the jury, "that as by the compact between Kentucky and Tennessee, the boundary line of thirty-six degrees thirty minutes north, was fixed several miles south of Walker's line, and of the land in controversy; the titles of the defendants were subject to the compact, and could only be sustained under it. That the state of Tennessee, by sanctioning the compact, admitted in the most solemn form that the lands in dispute were not within her jurisdiction, nor within the jurisdiction of North Carolina at the time they were granted; and that, consequently, the titles were subject to the conditions of the compact." To this opinion of the court the defendants excepted; and the validity of this exception constitutes the main subject of inquiry upon the present writ of error; the jury having found a verdict in favour of the plaintiffs upon this opinion, and judgment having been rendered in conformity thereto in the court below.

We are of opinion that the instruction given by the court below is entirely correct. It cannot be doubted, that it is a part of the general right of sovereignty, belonging to independent nations, to establish and fix the disputed boundaries between their respective territories; and the boundaries so established and fixed by compact between nations, become conclusive upon all the subjects and citizens thereof, and bind their rights; and are to be treated, to all intents and purposes, as the true and real boundaries. This is a doctrine universally recognised in the law and practice of nations. It is a right equally belonging to the states of this Union; unless it has been surrendered under the constitution of the United States. So far from there being any pretence of such a general surrender of the right, that it is expressly recognised by the constitution, and guarded in its exercise by a single limitation or restriction, requiring the consent of congress. The constitution declares, that "no state shall, without the consent of congress, enter into any agreement or compact with another state;" thus plainly admitting that, with such consent, it might be done: and in the present instance, that consent has been expressly given. The compact, then, has full validity, and all the

[Poole v. Fleeger.]

terms and conditions of it must be equally obligatory upon the citizens of both states.

Independently of this broad and general ground, there are other ingredients in the present case equally decisive of the merits. Although, in the compact, Walker's line is agreed to be in future the boundary between the two states, it is not so established as having been for the past the true and rightful boundary; on the contrary, the compact admits the fact to be the other way. While the compact cedes to Tennessee the jurisdiction up to Walker's line, it cedes to Kentucky all the unappropriated lands north of the latitude of thirty-six degrees thirty minutes north. It thus admits, what is in truth undeniable, that the true and legitimate boundary of North Carolina is in that parallel of latitude; and this also is declared in the charter of Charles the second, and in the constitution of North Carolina, to be its true and original boundary. It goes farther and admits that all claims under Virginia to lands north of that boundary, shall not be prejudiced by the establishment of Walker's line; but such claims shall be considered as rightfully entered or granted. The compact does, then, by necessary implication, admit that the boundary between Kentucky and Tennessee, is the latitude of thirty-six degrees thirty minutes; and that Walker's line is to be deemed the true line, only for the purpose of future jurisdiction.

In this view of the matter it is perfectly clear that the grants made by North Carolina and Tennessee, under which the defendants claimed, were not rightfully made, because they were originally beyond her territorial boundary; and that the grant, under which the claimants claim, was rightfully made, because it was within the territorial boundary of Virginia. So that upon this narrower ground, if it were necessary, as we think it is not, to prove the case, it is clear that the instruction of the court was correct.

And this disposes of the argument which has been pressed upon us, that it is not competent for a state, by compact, to divest its citizens of their titles to land derived from grants under the state; and that it is within the prohibition of the constitution, that "no state shall pass any law impairing the obligation of contracts." If the states of North Carolina and Tennessee could not rightfully grant the land in question, and the states of Virginia and Kentucky could, the invalidity of the grants of the former arises, not from any violation of the obligation of the grant, but from an intrinsic defect of title in the states. We give no opinion, because it is unnecessary in

[Poole v. Fleeger.]

this case, whether this prohibition of the constitution is not to be understood as necessarily subject to the exception of the right of the states, under the same constitution, to make compacts with each other; in order to settle boundaries and other disputed rights of territory and jurisdiction.

In the progress of the trial one or two other objections were made, which may require some notice. The defendants objected to the introduction of the will of Frederick Rohrer, under which the plaintiffs claimed as devisees, as evidence; first, because the probate and certificate of that will (it having been made and proved in Pennsylvania) were not such as to authorize its registration in the state of Tennessee; secondly, because the will was not registered in the state of Tennessee, until after the institution of this suit. The court overruled the objection. But it does not appear that any exception was taken to the opinion of the court upon this point, at the trial. On the contrary, the record states, that " no exception to the opinion of the court permitting the will to be read was taken in the progress of the trial, nor was it stated that the right to do so was reserved. The practice of the court is, for exceptions to be taken after trial, if deemed necessary." Under these circumstances, some difficulty has arisen as to the propriety of taking any notice whatsoever of this objection. In the ordinary course of things at the trial, if an objection is made and overruled as to the admission of evidence, and the party does not take any exception at the trial, he is understood to waive it. The exception need not, indeed, then, be put into form, or written out at large and signed; but it is sufficient that it is taken, and the right reserved to put it into form, within the time prescribed by the practice or rules of the court. We do not find any copy of the will or any probate or certificate thereof in the record, or any registration thereof; and it is, therefore, impossible for us to say, whether the ground assumed in the first part of the objection is well founded or not. This leads us strongly to the inference, that the objection was intentionally waived at the trial. The second ground is clearly unmaintainable; for, if the registration was rightfully made in Tennessee, it has relation backwards; and the time of the registration is wholly immaterial, whether before or after the institution of the suit.

Another objection made by the defendants at the trial was to the evidence of title offered by the lessors of the plaintiff, upon the ground that this title was a tenancy in common, which would not in

law support a joint demise. This objection was overruled, with an intimation that the point would be considered on a motion for a new trial. No exception was taken to this ruling of the court; and the new trial was, upon the motion, afterwards refused. The party not taking any exception, and acquiescing in the intimation of the court, must be understood to waive the point as a matter of error; and to insist upon it only as a matter for a new trial. But it is unnecessary to decide the point upon this ground; for, in the state of Tennessee, the uniform practice has been, for tenants in common in ejectment, to declare on a joint demise, and to recover a part or the whole of the premises declared for, according to the evidence of title adduced. This was expressly decided by the court in Barrow's Lessee v. Nave, 2 Yerger's Rep. 227, 228; and on that occasion the court added that this practice had never been drawn in question as far as they knew, or could ascertain; and in fact no other probably could be permitted after the act of 1801, ch. 6. sec. 60, which provided, "that after issue joined in any ejectment on the title only, no exceptions to form or substance shall be taken to the declaration in any court whatever."

The judgment of the circuit court is therefore affirmed, with costs.

This cause came on to be heard on the transcript of the record from the circuit court of the United States for the district of West Tennessee, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this Court, that the judgment of the said circuit court in this cause be, and the same is hereby affirmed, with costs.