304 So.2d 402 (1974)
QUICKICK, INC.
v.
QUICKICK INTERNATIONAL et al.
No. 9778.
Court of Appeal of Louisiana, First Circuit.
May 31, 1974.
Rehearing Denied June 28, 1974.
Writs Refused September 18, 20, 1974.
*403 Donn Moss, Baton Rouge, for appellant.
R. Boatner Howell, Jr., Baton Rouge, for appellees.
Before LANDRY, ELLIS and BAILES, JJ.
ELLIS, Judge:
This is a suit for rescission of a marketing contract, and for damages allegedly due for the breach thereof. Plaintiff is QuicKick, Inc., a Texas corporation. Defendants are QuicKick International, Ada Oil Company, and K. S. Adams, Jr.
Plaintiff corporation was formed under the laws of the state of Texas in March, 1969, to manufacture and sell QuicKick, an isotonic salt supplement beverage, which had been formulated over a period of time by W. Evans Howell. The original shareholders were Mr. Howell, K. S. Adams, Jr., H. L. Trentham, and Kevin P. Reilly.
On October 17, 1969, an agreement was entered into among QuicKick, Inc. and its shareholders which provided that a new corporation be formed, Mr. Adams to own 90% of its stock, and Mr. Howell 10%, to which QuicKick, Inc. would assign marketing rights, and to which it would sell various forms of QuicKick concentrate at stipulated prices.
*404 The contract further provided for the employment of Mr. Howell by both QuicKick, Inc. and the new corporation; it gave Mr. Trentham an option to purchase stock in the new corporation from Mr. Adams; it provided for loans by Mr. Adams and Mr. Trentham to QuicKick, Inc.; and it provided for expiration of certain restrictions on transfer of outstanding capital stock in QuicKick, Inc.
QuicKick International was duly chartered under Texas law, in accordance with the foregoing agreement, and, under date of November 3, 1969, the marketing contract provided for in the October 17 agreement was executed by Mr. Howell on behalf of QuicKick, Inc. It was never signed by anyone on behalf of International.
Immediately after the October 17 agreement, the hiring of staff and personnel for a nationwide marketing of QuicKick in various forms was begun. The marketing effort continued through the summer of 1970 at great expense, but with indifferent success.
Although considerable QuicKick concentrate was bought in various forms during this period, no payments were ever made from International to QuicKick, Inc. for these purchases. Demands for payment were not satisfied and this suit was eventually filed. The national marketing effort for QuicKick wound down and was eventually discontinued during the latter part of 1970. International's loss was in excess of $5,000,000.00.
This suit was filed on November 4, 1970, against International, for cancellation of the November 3 contract for various reasons, and for judgment of $327,583.45 allegedly due under the market contract. In its answer, International alleged various advances to QuicKick, Inc., and further alleged that the price charged for some of the concentrates purchased was excessive. It alleged that it had tendered the amount it claimed to be due to QuicKick, Inc., and that the tender had been refused. It further denied any other breach of the contract.
In December, 1971, International filed a supplemental answer and reconventional demand, alleging that the product sold by QuicKick, Inc. to it was defective in various respects. It alleged it was not liable for the price of such defective product, and reconvened for $5,471,000.00 as its loss allegedly caused by interference in its operation by QuicKick, Inc. and because of the defective product it was forced to repurchase or destroy.
QuicKick, Inc. then filed a supplemental petition making K. S. Adams, Jr. and Ada Oil Company parties defendant, alleging Adams' personal liability under the October 17, 1969 agreement, and also on the theory that International was his alter ego. In addition to the $327,583.45 originally demanded, plaintiff further prayed for $2,500,000.00 for damage to its trademark, trade name and good will and $1,500,000.00 for loss of future profits.
Mr. Adams filed exceptions to the jurisdiction over both his person and the subject matter, and to the sufficiency of service of process. These exceptions were referred to the merits of the case on motion of Mr. Adams and Ada, and answers were filed by both parties.
After an extended trial on the merits, judgment was rendered in favor of QuicKick, Inc. and against International and Mr. Adams, in solido, for $263,729.60 plus interest, and dismissing plaintiff's suit as to Ada. International's reconventional demand was dismissed. The judgment is silent as to the November 3, 1969, contract. International and Mr. Adams have taken a suspensive appeal to this Court. Since plaintiff has neither appealed nor answered the appeal, the judgment is final insofar as it dismisses the suit as to Ada.
In its reasons for judgment, the trial court found that Mr. Adams was personally bound under the October 17, 1969, agreement; that International was his alter *405 ego, and he was therefore responsible for its obligations; that Mr. Adams was therefore subject to the jurisdiction of the Court; and that the November 3, 1969, contract had been breached and should be cancelled.
In this Court, defendants allege that the trial court erred in its interpretation of the October 17, 1969, agreement; in holding that International was the alter ego of Mr. Adams; in overruling the declinatory exception of lack of jurisdiction over the person of Mr. Adams; in holding that the November 3, 1969, agreement was not a valid contract; and in construing both agreements as fixing the cost of concentrate to be used for product to be sold in glass decanters and in cans.
The latter two assignments of error relate to the liability of International and the extent thereof. With respect to the validity of the November 3 contract, we find we need not consider the point. Although the trial judge indicated in his reasons for judgment that the contract had been breached and should be cancelled, and that it might have been invalid for lack of International's signature, the judgment itself is silent on both of those points. Since plaintiff has not appealed from the judgment, it is final in that respect, and the question of the validity of the contract is therefore not presented by this appeal. We can, however, consider the question of International's liability for failure to make payments required by the contract.
The liability of International under the November 3 contract is not seriously disputed no error having been assigned to the judgment in that respect. The question of the amount of the award is raised as the final assignment of error. It is contended that no agreement was ever reached as to the price to be paid to plaintiff for concentrate to be used in making product to be sold in glass decanters and in cans. It is clear from the record that this concentrate was exactly the same as the concentrate used in dairy sales, the price of which is fixed in the contract. All invoices and all schedules of price which were sent by plaintiff to International reflected the same contract price. All bookkeeping entries of credits to plaintiff made in International's books reflect the same contract price, until the time that the dispute between the two corporations arose. We think it clear that the contention as to price of the concentrate was an afterthought on the part of International. Since we find no merit to defendants' contention as to the price of the product, and no other objection having been raised to the award, we find no error in the amount thereof.
Turning now to the question of jurisdiction, we note that the exception was filed by Mr. Adams, but was not decided in advance of the trial. Instead, on motion of Mr. Adams, the exception was referred to the merits, and an answer was filed by him. We are of the opinion that, in so doing, Mr. Adams waived his exception, and the Court acquired jurisdiction.
Article 7 of the Code of Civil Procedure provides as follows:
"Except as otherwise provided in this article, a party makes a general appearance which subjects him to the jurisdiction of the court and impliedly waives all objections thereto when, either personally or through counsel, he seeks therein any relief other than:
"1. Entry or removal of the name of an attorney as counsel of record;
"2. Extension of time within which to plead;
"3. Security for costs;
"4. Dissolution of an attachment issued on the ground of the non-residence of the defendant; or
"5. Dismissal of the action on the ground that the court has no jurisdiction over the defendant.

*406 "This article does not apply to an incompetent defendant who attempts to appear personally, or to an absent or incompetent defendant who appears through the attorney at law appointed by the court to represent him.
"When a defendant files a declinatory exception which includes a prayer for the dismissal of the action on the ground that the court has no jurisdiction over him, the pleading of other objections therein, the filing of the dilatory exception therewith, or the filing of the peremptory exception or an answer therewith when required by law, does not constitute a general appearance."
Since the law does not require that an answer be filed at the same time as the declinatory exception in district courts, the clear import of the foregoing is that the filing of an answer subjects the defendant to the jurisdiction of the Court unless he has first insisted on a decision on his exception to the jurisdiction over his person. It would be completely inconsistent to permit a defendant to proceed to trial on the merits in a court which he claims to have no jurisdiction over his person, and permit him to reserve any rights under his exception which he has not insisted be decided prior to trial. See also Articles 925 and 929 of the Code of Civil Procedure.
The major issues presented by this case revolve around the alleged personal liability of Mr. Adams for damages herein. The trial court found him liable both under the October 17 contract and as the alter ego of International.
Before proceeding to a resolution of these issues, we must decide whether our decision must be based on Texas or Louisiana law. Both plaintiff and International are incorporated under the laws of the State of Texas and are domiciled therein. Both the October 17 and November 3 agreements were drafted, and the former was executed, in Texas. The main office of International was in Texas, and all records of both corporations were maintained there. Plaintiff had an office in Texas, and its main office in Baton Rouge, Louisiana. We think it clear that the law of Texas should govern under those circumstances. See First Nat. Bank in Center, Texas v. Reglin, 266 So.2d 252 (La. App. 2 Cir. 1972).
Plaintiff argues that the provisions of Article 1391 of the Code of Civil Procedure preclude our use of Texas law in rendering a decision. That article provides:
"Every court of this state shall take judicial notice of the common law and statutes of every state, territory and other jurisdiction of the United States.
"The court may inform itself of such laws in any manner as it may deem proper, and the court may call upon counsel to aid it in obtaining such information.
"The determination of such laws shall be made by the court, and not by the jury, and shall be reviewable.
"A party may also present to the trial court any admissible evidence of such laws, but, to enable a party to offer evidence of the law in another jurisdiction or to ask that judicial notice be taken thereof, reasonable notice shall be given to the adverse parties either in the pleadings or otherwise.
"The law of a jurisdiction other than those referred to in the first paragraph of this article shall be an issue for the court, but shall not be subject to the foregoing provisions concerning judicial notice."
It is argued that the admitted failure of defendants to give the notice required by the fourth paragraph of Article 1391 now precludes their reliance on Texas law. The first two paragraphs of Article 1391 gives to every court in the State the duty and authority to notice and consider the laws of every other state. In this case, *407 the trial judge requested that counsel cite to him applicable Texas law, and that aspect of the case has been thoroughly briefed by all parties. We do not believe that the authority of the courts in this respect can be abridged because of some alleged technical insufficiency in the pleadings. Since the adoption of the Code of Civil Procedure, our Courts have not hesitated to avail themselves of this authority. See Pecora v. James, 150 So.2d 90 (La. App. 4 Cir. 1963); Morace v. Morace, 220 So.2d 775 (La.App. 1 Cir. 1969); First Nat. Bank in Center, Texas v. Reglin, supra.
The October 17, 1969, agreement reads, in its essential parts, as follows:
"THIS AGREEMENT, made an entered into in multiple originals this 17th day of October, 1969, by and among K. S. Adams, Jr. (`ADAMS'), H. L. Trentham (`RENTHAM'), William Evans Howell (`HOWELL'), Kevin P. Reilly (`REILLY'), and QuicKick, Inc., a Texas corporation (`QUICKICK').

"WITNESSETH:
"THAT, WHEREAS, QuicKick is engaged in the business of formulating, selling, distributing and marketing a mixture of ingredients for use in beverages and liquids as a salt supplement under the trade mark, name and brand of `QuicKick'; and
"WHEREAS, Adams, Trentham, Howell and Reilly together are the owners and holders of one hundred per cent (100%) of the issued and outstanding capital stock of QuicKick; and
"WHEREAS, the parties hereto mutually desire to provide for the formation of a new Texas corporation for the purpose of selling, distributing and marketing the products and commodities developed and manufactured by QuicKick and to make the other agreements hereinafter set forth with respect to QuicKick and the new corporation to be created;
"NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements of the parties hereto, Adams, Trentham, Howell, Reilly, and QuicKick do hereby mutually agree, each with the others, as follows:
"1. Promptly after the execution of this Agreement by the parties hereto, a new corporation shall be chartered under the laws of the State of Texas, ninety per cent (90%) of the fully paid and non-assessable capital stock of which shall be issued to and owned by Adams, or his nominee, and ten per cent (10%) of which shall be issued to and owned by Howell.
* * * * * *
"2. Upon the creation of the new corporation as herein provided, QuicKick and the new corporation shall enter into an agreement by the terms of which the new corporation shall have and be granted the perpetual and continuing sole and exclusive right and privilege of purchasing from QuicKick and of selling, distributing and marketing, at wholesale, retail and all other levels, all forms of `QuicKick', either directly or through third parties through the use of licensing agreements, distributor agreements, commission agreements, franchising agreements and all other types of agreement, and such Agreement shall bind and obligate QuicKick to sell and deliver `QuicKick' in all forms solely and exclusively to the new corporation at the prices hereinafter specified and shall prohibit QuicKick from selling such product in any form to any other party for consumption or resale, except that QuicKick shall have and retain the right to continue to sell and supply `QuicKick' in concentrate form to dairy outlets in the Houston market at present prices until such time as QuicKick shall have recovered its investment made prior *408 to October 1, 1969, in such market as reflected by QuicKick's balance sheet dated as of September 30, 1969, or until October 1, 1970, whichever event first occurs.
"The prices at which the various forms of `QuicKick' shall be sold and delivered by QuicKick to the new corporation are:
"Q.K.C. (dairy)2½ times the manufactured cost.
"Q.K. 1 and 5-2½ times the manufactured cost.
"Q.K.R. (pints)manufactured cost plus 25%.
"Q.K.W. (gallons)manufactured cost plus 25%.
* * * * * *
"The new corporation shall pay to QuicKick for all delivered products the price therefor as hereinabove provided within ten (10) days after receipt of invoice therefor.
* * * * * *
"The parties hereto expressly covenant and agree to execute any and all instruments and perform any and all acts necessary, appropriate or desirable to effectuate and accomplish the agreements and covenants herein contained.
"8. The covenants and agreements of the respective parties shall survive the creation and operation of the new corporation herein provided for.
"9. It is further mutually agreed and covenanted by and between the parties to this Agreement that the breach of any term, covenant or condition of this Agreement shall constitute a breach of the entire Agreement by the party or parties breaching any such term, covenant or condition.
* * * * * *
"12. It is further understood and agreed by the parties hereto that the written terms of this Agreement constitute the entire agreement between the parties hereto, and that no other terms, conditions, promises or covenants shall be part of this Agreement except as herein expressly stated. It is further agreed that this Agreement is personal to the parties hereto and may not be assigned by any party without express written consent of the other parties hereto."
The trial judge found the foregoing to be susceptible of an interpretation under which Mr. Adams was "given the marketing rights subject to the obligations contained therein with the additional right to form a corporation to carry out the provisions of the contract." He reasoned that this "would make International an agent to Adams, who would remain liable under the terms of the October 17, 1969, agreement."
We cannot agree with this interpretation. No personal interest whatsoever relative to marketing rights was granted to Adams in that contract. The obligation to create the new corporation is mutual as to all of the parties, and was discharged when the corporation was, in fact, created. The personal obligations which survive the execution of the November 3 contract are obviously those relative to stock rights, loans, salary contracts and other matters personal to the stockholders. We find no personal liability on Mr. Adams' part arising out of the October 17, 1969, contract.
Neither can we find that Mr. Adams was the alter ego of International. It is true that Mr. Adams controlled International. He owned 90% of the stock, was its president, and took an active interest in its affairs. The other officers and directors, except for Mr. Howell, were members of the Adams organization and subject to his authority. He was the ultimate source of the funds advanced to International for its operations, having guaranteed all of its loans and most of its accounts payable. Ultimately, he held International's note for over $4,000,000.00.
*409 International was legally incorporated under the laws of Texas, and maintained separate offices in Ada's office building in Houston. It had its own staff, files and bank account, and a separate set of books were kept on its financial affairs. It was incorporated with $1,000.00 initial capitalization, of which Mr. Adams advanced $900.00 and Mr. Howell paid $100.00.
It is clear from the record that all of the foregoing facts were known to the plaintiff corporation through Mr. Howell, Mr. Trentham, Mr. Adams, Mr. John Collins and Mr. L. W. Fisher, the latter two being members of Mr. Adams' organization and officers of both plaintiff and International.
In commenting on and deciding the case of Atomic Fuel Extraction Corporation v. Slick's Estate, 386 S.W.2d 180 (Tex.Civ. App.1964), the court said:
"Atomic also contends that Tom Slick was the alter ego of Transworld and Nuclear and is liable on the contract. The evidence showed that Slick wholly owned Transworld. He furnished money as loans to Transworld in the sum of $474,762.36 between 1957 and 1959. It had no income and its assets were speculative mining claims valued by the evidence anywhere from nothing to seven million dollars. Nuclear was an outgrowth of the uranium mining venture and it too was wholly owned and financed by Tom Slick. It had no bank account and no financial records for 1957. Both Transworld and Nuclear's board of directors consisted of persons closely associated with Tom Slick. Neither corporation held stockholders' meetings. Transworld held three, and Nuclear only one directors' meeting during 1957. Following the AEC's decision to terminate the milling contract, but not before, Slick wrote letters and began negotiations with the AEC in an effort to salvage the contract. He wrote letters to others also and spoke of `our company,' `a business venture which I have.' McGoodwin, who was Vice-President of Transworld and President of Nuclear, was also an attorney for Slick. There were other facts which showed that both Transworld and Nuclear were dependent upon Slick for funds with which to operate.
"In our opinion, however, the court properly instructed a verdict for defendant Slick. Atomic was never confused about the parties with whom it contracted. When it made its contracts with Transworld and Nuclear, it then knew about Slick, his position with respect to the two corporations, and that he was not a promisor. Atomic initiated negotiations with Slick Oil Company and knew McGoodwin represented Slick. It knew Slick was an officer of and wholly owned both corporations, and that they depended upon him for their operating expenses. In the case of Nuclear, it was Atomic's plan, as well as that of Transworld, to create it as a new company. Certainly nobody was mistaken about its finances or its purpose. Black, the representative for Atomic, in all these transactions admitted he knew Nuclear had no assets'didn't have a dime.' Slick signed no agreements. He sent two telegrams to the AEC prior to October 1, 1957, and signed both as a corporate officer. At Atomic's stockholders' meeting to approve the merger with Nuclear, Slick's name was not mentioned as the one who was furnishing the finances.
"Black, the attorney, director, secretary and dominating officer for Atomic, as well as the other officers and stockholders of Atomic, throughout all of the transactions with Transworld and Nuclear, had full information about Slick and knew that he was not a party to any contract with Atomic. No questions were raised and nobody asked Slick to bind himself personally. Atomic, with full knowledge, chose to deal with and continued to deal with the corporations to the exclusion of Slick. It was fully aware of the risks. Hanson v. Bradley, *410 298 Mass. 371, 10 N.E.2d 259, states the law which the trial court correctly applied:
"`The right and the duty of courts to look beyond the corporate forms are exercised only for the defeat of fraud or wrong, or the remedying of injustice. In the present case we have a corporation formed without substantial capital, relying on borrowing money to make valuable a hotel that it was buying on credit. The plaintiff dealt with that corporation. There is nothing to show that he was deceived. The fair inference is that he knew the worthlessness of the corporation with which he contracted, and knew that his contract was of no value unless the corporation could borrow money . . .
"The plaintiff was not wronged by the fact that the corporation was organized with a trifling capital and could not live except upon borrowed money; nor by the fact that the lenders insisted on security. He knew the essential facts and accepted the situation.'
"The Texas decisions follow the same rule. Pace Corporation v. Jackson, 155 Tex. 179, 284 S.W.2d 340; Staacke v. Routledge, 111 Tex. 489, 241 S.W. 994; Noblitt v. Barker, Tex.Civ.App., 97 S. W.2d 1010; Seymour Opera-House Co. v. Woolridge, Tex.Civ.App., 31 S.W. 234, 235. Accord, Farrier v. Hopkins, 131 Tex. 75, 112 S.W.2d 182."
There would be far less reason to pierce the corporate veil in this case than exists in the foregoing. We therefore hold that plaintiff was in no way deceived as to International's status or its financial affairs, and find no basis for holding International to be the alter ego of Mr. Adams.
Since we find no liability on Mr. Adams' part, either under the October 17 agreement or as alter ego of International, the judgment must be reversed insofar as it affects him personally.
The judgment appealed from is therefore reversed insofar as it holds K. S. Adams, Jr. solidarily liable with QuicKick International for damages, and there will be judgment dismissing plaintiff's suit as to him. In all other respects, the judgment is affirmed, with all costs to be borne by QuicKick International.
Reversed in part, affirmed in part, and rendered.