577 F.2d 1196
 OCCIDENTAL OF UMM al QAYWAYN, INC., Plaintiff-Appellant-Cross Appellee.
v.
A CERTAIN CARGO OF PETROLEUM LADEN ABOARD the TANKER
DAUNTLESS COLOCOTRONIS, etc., et al.,
Defendants-Appellees-Cross Appellants.
 No. 75-3088.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 9, 1978.
 
 Thomas M. Bergstedt, Lake Charles, La., Henry J. Read, David L. Stone, New Orleans, La., Leon Alexandroff, Louis Nizer, Gerald Meyer, Neil A. Pollio, J. Bond Smith, Jr., New York City, for plaintiff-appellant-cross appellee.
 John A. Patin, Lake Charles, La., L. Linton Morgan, S. Gene Fendler, Reginald E. Cassibry, New Orleans, La., Allan B. Goldman, Los Angeles, Cal., George Miron, Washington, D. C., for defendants-appellees-cross appellants.
 James W. Moorman, Asst. Atty. Gen., Land & Natural Resources Division, Bruce C. Rashkow, Chief, Marine Resources Section, U. S. Dept. of Justice, Washington, D. C., amicus curiae.
 Appeals from the United States District Court for the Western District of Louisiana.
 Before THORNBERRY, MORGAN and INGRAHAM, Circuit Judges.
 LEWIS R. MORGAN, Circuit Judge:
 
 
 1
 In these conversion actions, consolidated on appeal, the federal court is asked for a decision we consider impossible. The immediate question is whether the district court erred in granting appellee's motion for summary judgment. The district court determined that it should refrain from deciding the issue on the merits, the rights to oil extracted from the Persian Gulf, because the decision would call into question the acts of foreign states. We dismiss on the slightly different ground that the question presented is political, being both constitutionally devolving on the executive and judicially unmanageable, and therefore, not a "case or controversy" within Article III of the Constitution. On appellee's counterclaim to enjoin appellants from further litigation in this and other federally cognized jurisdictions, we reverse the district court and grant the injunction.
 
 
 2
 A thorough factual development is a necessary prerequisite to analysis.
 
 
 3
 A. Geography.
 
 
 4
 The scene for this political drama is the exotic Persian Gulf, once noted for the Arabian nights, now famous and important as a source of oil to light those nights. On the southern "lip" of the mouth of the Gulf lie the Trucial Sheikhdoms of Umm al Qaywayn (hereafter Umm), Sharjah, and Al Ajiman. Situated near the mouth of the Gulf, about 40 miles northwest of Umm, is the tiny island of Abu Musa. The island is also approximately 50 miles due south from Iran, the country with the largest contiguous border on the Gulf.
 
 
 5
 B. History, relatively ancient.
 
 
 6
 For almost a century, Great Britain had been the "protectorate" of the Trucial Sheikhdoms, including Umm and Sharjah. Pursuant to the treaty establishing this relationship, the United Kingdom was responsible for the Sheikhdoms' international relations, defense, and internal relations among the individual states. This protectorate jurisdiction included all the territories and territorial waters of the Sheikhdoms and territorial waters. As provided by the treaty, the protectorate ended in November 30, 1971.
 
 
 7
 During the course of this protectorate, a dispute over the sovereignty of Abu Musa had existed between Great Britain as agent of Sharjah, and Iran.[1] For example, the India Survey Map of 1897 represented the island in the colors of Persia (now Iran), as did the Viceroy's unofficial map of 1892. Later, in April of 1904, the dispute flared as the Persian government placed custom officials on the island and flew the Persian flag. This establishment of sovereignty was short-lived, however, and the evidence was quickly removed at the demand of the British government. Persia did not abandon its claim with this setback, however. In 1923, Persia reasserted its claim to Abu Musa by protesting the leasing, by Great Britain, of mineral rights to the island. In 1930, Great Britain and Persia discussed settlement of the dispute, but no accord was reached.
 
 
 8
 C. Modern History.
 
 
 9
 In the early 1960's, because of rising worldwide energy demands and the growth of offshore drilling technology, the Persian Gulf was becoming hot property. In 1964, perhaps as a response to this increased demand, Umm and Sharjah entered into an agreement, under the auspices of the British, establishing their territorial waters and continental shelf borders. This treaty not only established the territorial waters of the parties, but also established their respective continental shelf. The agreement was embodied in an admiralty map establishing the continental shelf of Umm as extending to the three-mile territorial waters of Abu Musa, recognized by the British as Sharjah's possession, giving Umm 37 miles of the intervening continental shelf.
 
 
 10
 On November 18, 1969, appellant and the Ruler of Umm contracted that appellant would have the exclusive right to explore for and extract oil within Umm, its continental shelf, and its territorial waters for forty years. The boundaries to this concession conformed to those established for Umm by the treaty with Sharjah of 1964. The British Foreign Office ratified the concession agreement, as a condition precedent required under the protectorate. A month later, Sharjah granted Buttes Oil Company, appellees' predecessor, a similar concession to extract oil from its territories. The boundaries of the Buttes concession also conformed to the 1964 treaty and the agreement was subsequently ratified by the British Foreign Office.
 
 
 11
 No conflict existed between the parties until March 25, 1970, when Buttes Oil and Gas Company notified the British representative to the Sheikhdoms that Buttes intended to drill for oil within the Occidental concession area, approximately 31 miles from Umm, 9 miles east of Abu Musa. Indeed, the drilling location coincided with that suggested by Occidental's exploratory testing. Also at that time, the British agent was made aware of a Sharjah decree purporting to extend its territorial waters from three to twelve miles, including those of Abu Musa. Of course, this unilateral decree did substantial violence to the 1964 treaty, and the British Foreign Office rejected the subsequent amendment of Buttes' concession agreement with Sharjah to reflect the extension. Additionally, the Buttes' request to drill was also denied by the British Government. Although the Foreign Office considered the unilateral action in violation of international law, it strove to bring about an amicable solution. Although Umm and Sharjah were persuaded by the United Kingdom to mediate their claims, mediation failed when Umm refused to abide by the mediator's decision.
 
 
 12
 Meanwhile, to further muddy the political waters, in a letter dated May 28, 1970, appellant was informed by the National Iranian Oil Company that it should desist all drilling operations in its concession area. The stated basis for this demand was that because Abu Musa was an Iranian possession, and because Iran recognizes twelve mile territorial limits, Occidental concession was within Iran's territories. Faced with the probability of intervention by Iran, the British Government maintained the suspension of all drilling in the disputed area.
 
 
 13
 On November 26, 1971, the dispute between Iran and Sharjah over Abu Musa was settled, at least practically and prospectively.[2] This agreement between Iran and Sharjah occurred only four days prior to the expiration of the British protectorate over the Trucial Sheikhdoms. Pursuant to this agreement, the island was essentially divided, and Sharjah's concession with Buttes was ratified and the future royalties were split between the sovereigns. On November 30, 1971, Iranian troops landed on Abu Musa, and the Iranian navy began patrolling the waters of the island. Shorn of the protection of the British Government, Umm had no means to protect its territories as defined under the 1964 agreement, and Occidental was without protection as well. Buttes began drilling immediately with salutory results. Buttes later sold interests in the oil to appellees, Ashland Oil Inc., Kerr McGee Corp., Skelly Oil Company, and Cities Service Company. Each was put on notice of Occidental's claim. In 1974, appellants began extracting oil from the disputed concession area, and among the shipments of this oil to the United States were those aboard the "Dauntless Colocotronis," "Lykavitos," and the "Anglo-Maersk," which were seized in proceedings.[3]
 
 
 14
 At least among the sovereigns, the rights to the royalties from the area were definitely settled. Some time after the Iranian occupation of Abu Musa, the Rulers of Umm and Sharjah agreed to divide royalties payable to Sharjah with Umm receiving thirty percent. Appellant suffered its final political reverse when in June of 1973, the Ruler of Umm terminated Occidental's concession for failure to pay rentals due under the contract.
 
 
 15
 D. History of the Case.
 
 
 16
 Prior to analysis of the case, a brief legal history of the dispute is helpful. The appellants and appellees' predecessors have once before litigated the underlying basis of their dispute. In Occidental Petroleum Corporation v. Buttes Gas and Oil Co., 331 F.Supp. 92 (C.D.Cal. 1971), aff'd, 461 F.2d 1261 (9th Cir. 1972), cert. denied, 409 U.S. 950, 93 S.Ct. 272, 34 L.Ed.2d 221, appellants brought an antitrust action against Buttes, and Clayco Petroleum Company and certain officers of the corporations alleging a conspiracy among the defendants to oust appellant from its concession. This action was filed more than eight months prior to the Iranian occupation of Abu Musa, and years prior to the exportation of oil. The district court held, and the court of appeals affirmed, that the court was precluded from piercing the veil of sovereign action by the "act of state" doctrine[4] and granted summary judgment. Although appellee contends that the Ninth Circuit case is res judicata for the case sub judice, we need not decide the question because we hold that we lack jurisdiction.
 
 
 17
 Actions No. 74-1192 and No. 75-0033 were brought as diversity actions.[5] Action No. 74-868 was brought as an in rem action in admiralty. The district court granted appellee's motion for summary judgment in the diversity actions holding that because the actions of foreign sovereigns were called into dispute, the "act of state doctrine" required the court to refrain from deciding on the merits. See Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964). Moreover, the district court concluded that, under the circumstances, the Hickenlooper Amendment, 22 U.S.C.A. 2370(e) (2) (Cum.1977), did not prevent such abstention.[6] The district court dismissed the admiralty action holding that admiralty jurisdiction was absent because if any conversion occurred, it occurred at the well-head not on the seas. Because we hold that no case or controversy exists, we dismiss all three claims for want of jurisdiction, but on the common ground that a resolution would involve a political question.[7]
 
 
 18
 A political question clearly emerges under the proper analysis. Although, whether a political question is present and the court lacks jurisdiction are issues committed to federal law, we need to address such questions only if they would arise in the diversity action framework.[8] See Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). Therefore, we must analyze appellant's claim as it would be tried, to determine whether a political question will emerge.[9] Shorn of its factual complexity, appellants claim a tortious conversion of oil. Because this is a diversity case, we apply the law of the forum, Louisiana, to the claim. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Additionally, because the operative facts occurred outside of Louisiana, we must also apply Louisiana's conflicts principles to determine which forum's law to apply. Klaxon v. Stentor Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Applying these principles, we find that to successfully maintain its tortious conversion action, appellant would have to establish its right to possess the oil at the time of conversion.[10] Appellant apparently contends that the conversion occurred when appellant was supplanted by Buttes through the intervention of Iran, sometime after November 30, 1971.[11] Because, as a matter of international law, one who receives an interest in land which is in dispute between sovereigns takes subject to the dispute, Coffee v. Groover, 123 U.S. 1, 29-30, 8 S.Ct. 1, 31 L.Ed. 51 (1887); Poole v. Fleeger, 36 U.S. 185, 9 L.Ed. 680 (1837),[12] appellant must necessarily develop Umm's right to undisputed possession of the portion of the continental shelf where the oil was extracted at the time the interest was passed, 1969. It is evident from the record, however, that the sovereignty, Abu Musa, and, derivatively, its continental shelf was in dispute between Iran and Sharjah (through Great Britain). Therefore, in order to resolve appellant's right to possess the oil, we would have to resolve the dispute over Abu Musa. The resolution of a territorial dispute between sovereigns, however, is a political question which we are powerless to decide.
 
 
 19
 Throughout the history of the federal judiciary, political questions have been held to be nonjusticiable and therefore not a "case or controversy" as defined by Article III. In Ware v. Hylton, 3 Dall. 199, 300, 1 L.Ed. 568 (1796), the Supreme Court recognized that in the realm of foreign relations policy considerations render issues incompetent for a decision by the court. In Marbury v. Madison, 1 Cranch 137, 164-166, 2 L.Ed. 60 (1803), Chief Justice Marshall acknowledged the existence of a class of cases which involve a "mere political act of the executive" and which were placed by the Constitution in the hands of the executive. The Supreme Court therefore appreciated that the genesis of the political question is the constitutional separation and dispersement of powers among the branches of government. In Coleman v. Miller, 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939), the Supreme Court clearly recognized that the political question doctrine partakes not only of the existence of separation of powers, but also of the limitation of the judiciary as a decisional body. The Court stated: "In determining whether a question falls within (the political question category), the appropriateness under our system of government of attributing finality to the action of the political departments and also the lack of satisfactory criteria for a judicial determination are dominant considerations." The Court was merely admitting that they were not tribal wisemen dispensing divinely or theoretically inspired judgments, but were a court limited to the application of predetermined law.
 
 
 20
 In Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), the Supreme Court extensively reviewed the history and evolution of the political question. As a result of this survey, the Court identified a number of basic characteristics or considerations relevant to the existence of a political question. The Court held that the inextricable presence of one or more of these factors will render the case nonjusticiable under the Article III "case or controversy" requirement, and therefore, the Court would be without jurisdiction. In this most definitive pronouncement, the Court identified the following factors as relevant to the affirmative determination of the existence of a political question:
 
 
 21
 (1) "a textually demonstrable commitment of the issue to a coordinate political department"
 
 
 22
 (2) "a lack of judicially discoverable and manageable standards"
 
 
 23
 (3) "the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion"
 
 
 24
 (4) "the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government"
 
 
 25
 (5) "an unusual need for unquestioning adherence to a political decision already made"
 
 
 26
 (6) "the potentiality of embarrassment from multifarious pronouncements by various departments on one question"
 
 
 27
 369 U.S. at 217, 82 S.Ct. at 710. In the instant case, nearly every one of the factors is present and the vitality of the political question in the arena of foreign relations is abundantly demonstrated.
 
 
 28
 The ownership of lands disputed by foreign sovereigns is a political question of foreign relations, the resolution or neutrality of which is committed to the executive branch by the Constitution. As has been demonstrated, to determine whether a tortious conversion has occurred, it is necessary to determine the sovereign ownership of the portion of the continental shelf from which the oil was extracted. Although sovereigns are not directly involved, a judicial pronouncement on the sovereignty of Iran or Sharjah would be unavoidable. Such a determination is constitutionally reserved to the executive branch, however. Just as the judiciary will follow an executive determination as to which nation has sovereignty over a disputed area, United States v. Klintock, 5 Wheat. 144, 149, 5 L.Ed. 55 (1820), so must the judiciary refuse to decide the dispute in the absence of executive action because of that absence of direction. That is, in the language of Baker v. Carr, supra, the question of sovereignty is committed to the executive branch by the Constitution, and decision of the issue is impossible in the absence of the executive policy decision. Additionally, we are persuaded that a judicial determination would reflect a lack of respect for the executive branch, particularly the State Department. Contained in the Government's amicus brief is a letter from the State Department[13] indicating the importance of neutrality in the politically and economically sensitive Middle East.[14] A decision in this case, the State Department warns, would seriously impinge on executive neutrality. Therefore, we are convinced that the issue of sovereignty over disputed territory is a political question reserved to the executive branch.
 
 
 29
 The issue of sovereignty is political not only for its impact on the executive branch, but also because judicial or manageable standards are lacking for its determination. To decide the ownership of the concession area it would be necessary to decide (1) the sovereignty of Abu Musa, (2) the proper territorial water limit and (3) the proper allocation of continental shelf. A judicial resolution of the dispute over Abu Musa between Iran and Sharjah is clearly impossible. In their external relations, sovereigns are bound by no law; they are like our ancestors before the recognition or imposition of the social contract. A prerequisite of law is a recognized superior authority whether delegated from below or imposed from above where there is no recognized authority, there is no law. Because no law exists binding these sovereigns and allocating rights and liabilities, no method exists to judicially resolve their disagreements. The ownership of the island, and derivatively its waters, has long been the subject of dispute. Were we to resolve this dispute we would not only usurp the executive power, but also intrude the judicial power beyond its philosophical limits.
 
 
 30
 The international law of territorial waters and of the continental shelf would also be involved in determining Occidental's right to oil from the concession area. Although some standards have been developed for the delineation of territorial waters, these formulations leave unresolved the permissible seaward extent of territorial waters. See 4 Whiteman, Digest of International Law 94-137 (1965). Therefore, we would be in a judicial no-man's land were we to purport to decide the legality of Sharjah's unilateral extension of its territorial waters or Iran's twelve-mile limit. Moreover, the ownership of the concession area would depend upon the ownership of the continental shelf between Abu Musa and Umm.[15] Again, although some standards have been developed, these standards depend in part on the existence of agreement among sovereigns. Because ownership of the continental shelf is derivative of the ownership of the unsubmerged land, the extent and ownership of Abu Musa's shelf is necessarily in dispute. No manageable law exists to resolve disputed continental shelf ownership, however. See Article VI, Convention on the Continental Shelf, 15 U.S.T. The nexus between the absence of manageable standards and the political question is quite evident. Resolution of disputed continental shelf can only occur by the political action of the sovereigns themselves.[16]
 
 
 31
 On cross-appeal, we are asked to review the decision of the district court refusing to grant cross-appellant's motion for an injunction against all pending and further litigation, both in state and federal courts. The result of the immediate imposition of this injunction would serve to deprive the appellant of its statutory remedy of seizing further shipments of oil. On the other hand, appellees have a right to a speedy determination of this issue to avoid endless seizures that may amount to a major nuisance if this action is not finally determined on appeal.[17] We therefore grant the injunction in order to protect the appellee, and stay the injunction pending disposition by the Supreme Court, in order to protect the appellant and promote a speedy resolution of this problem.[18] Should the appellant fail to appeal this judgment, the stay shall expire with the time limit for filing the appeal.
 
 
 32
 DISMISSED in part, REVERSED in part.
 
 
 
 [1]
 Appellant contends that the district court erred in permitting appellees to introduce evidence of a longstanding dispute between Iran and Sharjah over Abu Musa because of appellees' agreement to limit discovery on the issue. Even if the agreement could be deemed a stipulation the federal court is not bound by a factual stipulation that will impact on its jurisdiction. Just as the court will not be bound by the pleadings in collusive federal question cases, Lord v. Veazie, 8 How. 251, 12 L.Ed. 1067 (1850) and collusive diversity claims, Caribbean Mills, Inc. v. Kramer, 392 F.2d 387 (5th Cir. 1968), so would the court not be bound by stipulations on which the existence of a "case or controversy" might turn
 
 
 [2]
 By the terms of this partition agreement neither Sharjah nor Iran abandoned its claim to Abu Musa in favor of the other
 
 
 [3]
 Immediately after the seizures, the oil is released to the appellees as provided by agreement. The appellees have not been required to post bond
 
 
 [4]
 In 1897 the Supreme Court formulated what has become known as the "act of state" doctrine. The Court held that "the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory." Underhill v. Hernandez, 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897). This is not an abstention doctrine, but rather resembles a conflicts of laws principle. See Ricaud v. American Metal Co., 246 U.S. 304, 310, 38 S.Ct. 312, 62 L.Ed. 733 (1917). Although in one decision the Court stated both that the doctrine had constitutional underpinnings and the doctrine was not compelled by the Constitution, the better view would be that the doctrine is constitutionally compelled by the concept of separation of powers and placement of plenary foreign relations powers in the executive. See Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964)
 
 
 [5]
 The civil actions were first brought in the Fourteenth Judicial District Court for the Parish of Calcasieu as sequestration proceedings pursuant to Article 3501 of the Louisiana Code of Civil Procedure. The appellants, removed to the federal district court of the Western District of Louisiana, claim diversity of citizenship
 
 
 [6]
 In response to the refusal of the Supreme Court to pierce the sovereign veil in Sabbatino, Congress passed the so-called Hickenlooper Amendment designed to prevent such abstention. The amendment provides, in pertinent part:
 Notwithstanding any other provision of law, no court in the United States shall decline on the ground of the federal act of state doctrine to make a determination on the merits giving effect to the principles of international law in a case in which a claim of title or other right to property is asserted by any party including a foreign state (or a party claiming through such state) based upon (or traced through) a confiscation or other taking after January 1, 1959, by an act of that state in violation of the principles of international law, including the principles of compensation and the other standards set out in this subsection: Provided, That this subparagraph shall not be applicable (1) in any case in which an act of a foreign state is not contrary to international law or with respect to a claim of title or other right to property acquired pursuant to an irrevocable letter of credit of not more than 180 days duration issued in good faith prior to the time of the confiscation or other taking, or (2) in any case with respect to which the President determines that application of the act of state doctrine is required in that particular case by the foreign policy interests of the United States and a suggestion to this effect is filed on his behalf in that case with the court.
 22 U.S.C.A. § 2370(e)(2) (Cum.1977). It should be noted that if the act of state doctrine is constitutionally compelled, as was both suggested and negated in Sabbatino, the Hickenlooper Amendment would be ineffective. See note 4, supra.
 
 
 [7]
 As will be developed infra, a determination of sovereignty over Abu Musa is necessary to the ultimate resolution of the right to the oil in this case. This question, however, we hold to be a political question and therefore non-justiciable. Note well that this question would also have to be resolved under the "act of state" doctrine
 
 
 [8]
 We analyze the question with regard to the diversity action only because the procedure is more involved. The political question emerges directly under admiralty jurisdiction because we would immediately apply international law as a matter of federal law. See Kossick v. United Fruit Co., 365 U.S. 731, 81 S.Ct. 886, 6 L.Ed.2d 56, reh. denied, 366 U.S. 941, 81 S.Ct. 1657, 6 L.Ed.2d 852 (1961). As a matter of federal law the district court would then determine whether the conversion violated the principles of international law
 
 
 [9]
 Appellant complains that the court is unduly delving into the merits to determine the presence of a political question. Just as it is necessary to delve into the "merits" of a case to determine whether the claimant has sustained an injury in fact to determine standing, United States ex rel. Chapman v. Federal Power Commission, 345 U.S. 153, 156, 73 S.Ct. 609, 97 L.Ed. 918 (1953), so must we analyze the legal "merits" of the instant case in order to determine whether a case or controversy exists
 
 
 [10]
 In Importsales v. Lindeman, 231 La. 663, 92 So.2d 574 (1957), the Louisiana Supreme Court stated that the essence of conversion is the wrongful deprivation of the claimant's possession, to which he is rightfully entitled. Thus, in order to successfully maintain a conversion action, appellant would have to show that at the time of conversion it was entitled to possession of the res. As a matter of conflicts, if this action did not involve acts of foreign states, a Louisiana court would apply the law of the forum in which the conversion occurred to determine whether appellant was entitled to possession. See Matney v. Blue Ribbon Inc., 12 So.2d 249, 253 (La.App.1942); Quickkick v. Quickkick International, 304 So.2d 402, 406 (La.App.1974). Because appellee traces its title to the oil to acts of the sovereigns of Sharjah and Iran in supplanting appellant with Buttes, however, a court setting in Louisiana would follow the "act of state" doctrine and accept the act of the sovereign as a rule of decision. Monte Blanco Real Estate Corp. v. Wolvin Line, 147 La. 563, 85 So. 242 (1920). It is clear that the Louisiana Supreme Court intended that the act of state doctrine operate as a conflicts principle and that Louisiana courts will accept and apply as law the acts of foreign sovereigns. The Louisiana Supreme Court also made it abundantly clear that it considered the act of state doctrine mandated by federal law. The Hickenlooper Amendment, however, prevents any United States court from applying the federal act of state doctrine if the confiscation violated international law. A Louisiana court, therefore, would apply international law to determine whether the Hickenlooper Amendment is applicable. Because the Hickenlooper analysis is federal, however, the Louisiana court would be bound by the international law as developed by the Supreme Court in Poole v. Fleeger, 36 U.S. 185, 9 L.Ed. 680 (1837) and Coffee v. Groover, 123 U.S. 1, 8 S.Ct. 1, 31 L.Ed. 51 (1887)
 
 
 [11]
 The explanation for appellant's ambiguity with regard to the conversion may be the mistaken conception that the Hickenlooper Amendment in some way provides a cause of action. At most, the amendment is a federal conflicts principle; at least, a mandate to the states to follow state law, not the federal "act of state" doctrine
 
 
 [12]
 It is arguable that the conversion did not occur until the oil was actually severed from the realty in 1974. At that time, however, the boundary disputed was settled among the sovereigns, at least practically. Application of Coffee and Poole would directly result in vesting title in the appellees. It is also arguable, however, that because Iran and Sharjah still refuse to recognize each other's claim, the dispute was not settled as a matter of international law. See note 2, infra. Therefore, we only use these cases for the proposition that under international law if a dispute exists at the time of taking, in the instant case, 1969, when the concession was granted by Umm, then appellant took subject to that dispute. As has been developed, supra, the sovereignty was disputed in 1969
 
 
 [13]
 In pertinent part the letter states:
 Your Division has asked for our views concerning certain aspects of the case of Occidental of Umm Al Qaiwain, (sic) Inc. v. A certain Cargo of Petroleum Laden Aboard the Tanker "Dauntless Colocotonic," (sic) Etc., et al., C.A. 5, No. 75-3088.
 It is our understanding that the disposition of this case would require a determination of the disputed boundary between Umm Al Qaiwain on the one hand and Sharjah and Iran on the other at the time Umm Al Qaiwain granted the concession in issue to Occidental. It is our view that it would be contrary to the foreign relations interests of the United States if our domestic courts were to adjudicate boundary controversies between third countries and in particular that controversy involved here.
 The extent of territorial sovereignty is a highly sensitive issue to foreign governments. Territorial disputes are generally considered of national significance and politically delicate. Even arrangements for the peaceful settlement of territorial differences are often a matter of continued sensitivity.
 These considerations are applicable to the question of Umm Al Qaiwain's sovereignty over the continental shelf surrounding Abu Musa at the time of the concession to Occidental and to the subsequent arrangements worked out among the affected states. For these reasons, the Department of State considers that it would be potentially harmful to the conduct of our foreign relations were a United States court to rule on the territorial issue involved in this case.
 We believe that the political sensitivity of territorial issues, the need for unquestionable U.S. neutrality and the harm to our foreign relations which may otherwise ensue, as well as the evidentiary and jurisprudential difficulties for a U.S. court to determine such issues, are compelling grounds for judicial abstention.
 We do not believe that this judicial self-restraint should turn on such analytical questions as whether the so-called Act of State doctrine which is traditionally limited to governmental actions within the territory of the respective state can apply to an exercise of disputed territorial jurisdiction. It rather follows from the general notion that national courts should not assume the function of arbiters of territorial conflicts between third powers even in the context of a dispute between private parties. As a result, we are of the view that the court should be encouraged to refrain from setting the extent of Umm Al Qaiwain's sovereign rights in the continental shelf between its coast and Abu Musa at the time of its grant of the concession to Occidental.
 
 
 [14]
 In determining whether to abstain or dismiss because of conflicting executive interest, federal courts are becoming more amenable to receiving opinion by the executive branch. See First National City Bank v. Banco Nacional de Cuba, 406 U.S. 759, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972); Bernstein v. N. V. Nederlandsche-Amerikaansche, 210 F.2d 375 (2d Cir. 1954). Although these are act of state doctrine cases, not political questions, it is nonetheless clear that whether the state department believes that judicial action would interfere with its foreign relations is germane to whether a court may decide actions involving foreign relations
 
 
 [15]
 According to Article I of the Convention on the Continental Shelf, the continental shelf begins at the termination of the territorial waters and extends "to a depth of 200 meters or, beyond that limit, to where the depth of the superjacent waters admit of the exploitation of natural resources . . . ." Thus, rights to the continental shelf of Abu Musa depend both upon the extension of territorial waters by Sharjah and the sovereignty over Abu Musa itself
 
 
 [16]
 The response to the appellant's plea for a day in court can be interpolated from Ware v. Hylton, supra. The Supreme Court suggested that anyone dismissed from the judicial remedy because of executive prerogative should, of course, seek recourse through the intervention of the executive. Because the president holds plenary power in foreign relations, however, the president is free to refuse. Should the president ever officially act on a political issue, we would be constitutionally bound to accept his act. Moreover, there is no law against executive advisory opinions. As an alternative, the executive could create administrative courts to handle all political cases, review to the Supreme Court limited to the existence of a political question
 
 
 [17]
 As of May 9, 1975, there were 58 suits pending involving the same set of facts; 23 in the Western District of Louisiana, 12 in the Eastern District, 3 in the Eastern District of Texas, 2 in the Virgin Islands, 17 in the Louisiana State Court, Calcaieu Parish, and one in Texas State Court, Jefferson County. At the time of appeal, approximately 120 such suits were pending
 
 
 [18]
 Although federal courts are normally precluded from enjoining pending state litigation, an injunction is proper "where necessary in aid of its jurisdiction or to protect or effectuate its judgments." 28 U.S.C.A. § 2283. Because we have held that, as a matter of federal law, a political question emerges we deem it necessary to enjoin state proceedings in order to effectuate our judgment that the issue is one committed to the executive. Such an injunction also is necessary to aid the jurisdiction of the Supreme Court to finally resolve the question of the existence of a political question