606 F.2d 358
 13 ERC 1833
 Lillian J. BADGLEY, Emil Lake and Helen Lake, George Elwood,
Admr., Estate of B. Van Loan, Lloyd and Eloise L.
Canfield, George and Helen Gregory,
Plaintiffs-Appellees,
v.
The CITY OF NEW YORK, Defendant-Appellant.
 Nos. 385-389, Dockets 78-7196 to 78-7200.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 5, 1979.
Decided Sept. 27, 1979.
 
 Michael R. Gottlieb, Woodbourne, N. Y. (Kalter & Gottlieb, Woodbourne, N. Y., on the brief), for appellees Elwood, Gregory, Badgley and Lake.
 Jack Weinberg, New York City (Graubard, Moskowitz, McGoldrick, Dannett & Horowitz, New York City and Herman E. Gottfried, Margaretville, N. Y., Jay C. Cooke and Steven J. Brill, New York City, of counsel, on the brief), for appellees Canfield.
 Morris Einhorn, New York City (Allen G. Schwartz, Corp. Counsel, New York City, L. Kevin Sheridan, Leonard Olarsch and William P. Murray, New York City, of counsel, on the brief), for appellant.
 Before WATERMAN, MANSFIELD and TIMBERS, Circuit Judges.
 WATERMAN, Circuit Judge:
 
 
 1
 These actions consolidated for trial, were brought by or in the name of, owners of riparian land situated in Pennsylvania, who claim that the value of their lands along the Delaware River and its West Branch was diminished by the City of New York's impoundment, diversion and manipulation of the headwaters of the Delaware River for the City's public water supply purposes. The City's answer admitted that it impounds and diverts the Delaware waters and that it manipulates the flow of the river. The City contended, however, that these acts were authorized by the U.S. Supreme Court's equitable apportionment of the Delaware River waters, decreed in New Jersey v. New York, 347 U.S. 995, 74 S.Ct. 842, 98 L.Ed. 1127 (1954) (New Jersey v. New York IV )[1], litigation to which the Commonwealth of Pennsylvania was a party. Accordingly, the City asserted that the rights of these individual riparian landowners in Pennsylvania were adjudicated with those of Pennsylvania itself and are thus barred.
 
 
 2
 In June 1975, a non-jury trial on the issues of liability and damages was held in the United States District Court for the Southern District of New York (Brieant, District Judge). On September 4, 1976, the trial record was reopened to allow submissions by the parties with reference to legislation enacted in July 1976, 1976 N.Y.Laws ch. 888, codified at N.Y.Envir.Conserv.Law §§ 15-0801 to -0807 (McKinney Supp.1979). On March 31, 1978, the trial court issued its decision, 450 F.Supp. 846 (SDNY 1978), setting forth its findings of fact and conclusions of law, awarding damages plus interest to the plaintiffs appellees and against the City. From that judgment the City appeals, raising three allegations of error: (1) that the district court erred in holding that common law riparian rights are not destroyed or altered in streams, the waters of which have been apportioned by a United States Supreme Court decree invoking the common law doctrine of equitable apportionment; (2) that the district court was incorrect in determining that the amount of damages to be awarded to appellees should not be affected by a post-trial two-year experimental program to ascertain if and to what extent certain of the damaging conditions underlying the judgment herein can be ameliorated; and (3) that the district court's method of computing damages was erroneous.
 
 
 3
 Inasmuch as we reverse the judgment below and order the entry of judgment for the appellant City, and as we base our holding upon the first issue, we need not and do not reach the latter two issues.
 
 
 4
 The Delaware River begins its flow within the bounds of New York State. The East Branch, which is entirely within New York State, and the West Branch, which is also entirely within New York State, except for approximately 8 miles above Hancock, N. Y., join at Hancock to form the main stream of the Delaware River. Thereafter the river flows in a generally southeasterly direction. Commencing about 4 miles south of Deposit, New York, the West Branch forms the boundary line between New York and Pennsylvania for approximately 8 miles, and thereafter the main stream forms the boundary line for some 68 miles to Port Jervis, N. Y. At Tri-State Rock, near Port Jervis, New York, the boundaries of New Jersey, New York and Pennsylvania converge. Below Tri-State Rock the river constitutes the boundary between New Jersey and Pennsylvania, and at the head of Delaware Bay near Wilmington, Delaware it discharges into the Atlantic Ocean.
 
 
 5
 In order to meet its increasing need for supplies of public water New York City in 1929 began to plan the diversion of the waters of the Delaware River and its tributaries. Shortly thereafter, the State of New Jersey commenced an original suit in the U.S. Supreme Court against the State of New York and the City of New York to enjoin and restrain any diversion of the waters of the Delaware River and its tributaries. In its bill of complaint New Jersey alleged that the proposed diversion would deprive New Jersey "and its citizens as riparian owners along the Delaware River of the natural, unobstructed and undiminished flow of its waters in violation of their rights under the common-law," and would thereby "take the property of the plaintiff and its citizens without due process of law," in violation of the fourteenth amendment of the U.S. Constitution. New Jersey further alleged that the proposed diversion would substantially harm navigation, water power, sanitation, industrial use, oysters, fish, water supply, agriculture and recreation in the Delaware Valley basin.
 
 
 6
 The Commonwealth of Pennsylvania was permitted to intervene, New Jersey v. New York I, 280 U.S. 528, 50 S.Ct. 151, 74 L.Ed. 595 (1930), upon filing a Statement of Interest and Relief desired. In its statement Pennsylvania set forth its opposition to the application of the common law doctrine of riparian rights advocated by New Jersey inasmuch as that doctrine would prevent the development and use of the Delaware River and its tributaries as a present and future source of water supply for Philadelphia and eastern Pennsylvania. Instead, Pennsylvania proposed a fair and equitable division of the waters of the Delaware River and its tributaries between the three states in accordance with the doctrine of equitable apportionment.
 
 
 7
 Following considerable testimony before Special Master Charles N. Burch, Esq., the Special Master prepared a report and recommended decree to the Supreme Court which was adopted and incorporated in the decision and decree entered on May 25, 1931. New Jersey v. New York II, 283 U.S. 805, 51 S.Ct. 645, 75 L.Ed. 1425 (1931). The Decree, adopting the doctrine of equitable apportionment, limited New York's diversion to 440 million gallons daily (m.g.d.), and, as proposed by the Commonwealth of Pennsylvania, imposed a compensatory release plan. Under this plan, releases were required from New York reservoirs to maintain flows at Port Jervis, New York, at or above 1535 cubic feet per second (c.f.s.), and at Trenton, New Jersey, at or above 3400 c.f.s., provided that the maximum release required would be 30 per cent of the average diversion area's yield, or 402.6 c.f.s. The purpose of these releases was to protect downstream states from potential injuries to municipal, recreational and fishery uses, particularly during low-flow periods. The Decree also required the construction of a sewage treatment plant at Port Jervis. Paragraph 6 of the 1931 Decree provided that the Court's jurisdiction should be a continuing one and any party was authorized to apply subsequently for further action or relief, or for any modification of the Decree.
 
 
 8
 In April 1952 the City petitioned the Court to amend the 1931 Decree so as to allow an increase in the diversion of Delaware River waters of as much as 800 m.g.d. The States of New York, New Jersey, Pennsylvania and Delaware appeared as parties or as interveners, and the matter was referred to Special Master Kurt F. Pantzer, Esq. Following hearings before the Special Master and a lengthy series of negotiating sessions, the parties agreed to the terms of a consent decree to replace the 1931 Decree. This consent decree was reported by the Special Master and entered by the Court on June 7, 1954. New Jersey v. New York IV, 347 U.S. 995, 74 S.Ct. 842, 98 L.Ed. 1127 (1954).
 
 
 9
 The 1954 Consent Decree authorizes the City of New York, following the completion of the Cannonsville Reservoir on the West Branch, to divert up to 800 m.g.d. subject to a new and somewhat different scheme for compensatory releases known as the "Montague Formula." This Formula requires the City to maintain certain minimum flows of water at Montague, New Jersey, approximately 75 miles downstream from the confluence of the East and West Branches of the River. The 1954 Decree further provides for certain excess releases depending upon the City's expected consumption of water, for the appointment of a River Master, and continues to require sewage treatment at Port Jervis. As in the 1931 Decree, the Court retained jurisdiction of the dispute, permitting the parties to apply for modification of the Decree, or for any pertinent supplemental orders. In 1961 the four basin states entered into a Compact creating the Delaware River Basin Commission (hereinafter DRBC), Del.Code tit. 7, §§ 6501-6511 (1974); N.J.Stat.Ann. §§ 32:11 D-1 to D-110 (West 1963); N.Y.Envir.Conserv.Law §§ 21-0701 to -0723 (McKinney 1973); Pa.Stat.Ann. tit. 32, §§ 815.101 .106 (Purdon 1967), which Compact subsequently was approved by Congress, Delaware River Basin Compact, Pub.L.No.87-328, 75 Stat. 688 (1961).
 
 
 10
 The general purposes of the Compact are "to promote interstate comity; to remove causes of present and future controversy; to make secure and protect present developments within the states; to encourage and provide for the planning, conservation, utilization, development, management and control of the water resources of the basin; (and) to provide for cooperative planning and action by the signatory parties with respect to such water resources." (Delaware River Basin Compact, Art. I, par. 1.3(e)).
 
 
 11
 Throughout Article 3 of the Compact, the Article setting forth the powers and duties of the Commission, there is constant reference to limitations upon the Commission, limitations deriving from the Decree of the United States Supreme Court in New Jersey v. New York IV, 347 U.S. 995, 74 S.Ct. 842, 98 L.Ed. 1127. Though in extraordinary circumstances, such as drought, the Commission may direct increases or decreases in any allocation or diversion or release of water required by the above mentioned decree, it is clear that, except for such an emergency, the Commission may not act, and nothing in the Compact shall be construed in any way so as to impair, diminish, or otherwise adversely affect the rights, powers, privileges, conditions, and obligations contained in that decree. For instance, Article 3, Section 3.3 reads as follows:
 
 
 12
 3.3 Allocations, Diversions and Releases. The Commission shall have the power from time to time as need appears, in accordance with the doctrine of equitable apportionment, to allocate the waters of the basin to and among the states signatory to this compact and to and among their respective political subdivisions, and to impose conditions, obligations and release requirements related thereto, subject to the following limitations:
 
 
 13
 (a) The commission, without the unanimous consent of the parties to the United States Supreme Court decree in New Jersey v. New York, 347 U.S. 995, 74 S.Ct. 842, 98 L.Ed. 1127 (1954), shall not impair, diminish or otherwise adversely affect the diversions, compensating releases, rights, conditions, obligations, and provisions for the administration thereof as provided in said decree; . . . .
 
 
 14
 subject, however, to the emergency provision previously mentioned.
 
 
 15
 Moreover, in Article 3, Section 3.4, each of the signatory states waived or relinquished for the duration of the Compact, any right, privilege or power a state may have to apply for any modification of the terms of the Decree in New Jersey v. New York IV, which would increase or decrease the releases required, except through a proceeding in the Supreme Court to modify the Decree or in the event of an emergency such as drought.
 
 
 16
 Despite the terms of the 1954 Decree and the Compact, the district court below found, 450 F.Supp. 846 (1978), that the plaintiffs as riparian owners are entitled to the "full natural flow of the Delaware River," Id. at 864, and that "riparian rights within a state are purely a matter of that state's concern . . . and are not, By that fact alone, destroyed or altered when the Supreme Court applies federal common law To conflicts between the states and apportions the total waters of the stream among the various competing interests." Id. at 866. The district court noted that any Parens patriae suit brought by one state against another state for the single purpose of protecting the property rights of its individual citizens would be barred by the Eleventh Amendment to the U. S. Constitution. From this the court below concluded that the Commonwealth of Pennsylvania could not have the rights of these individual plaintiffs adjudicated in the proceedings before the Supreme Court. Accordingly, the district court rejected the City's argument that under the federal common law doctrine of equitable apportionment, as applied by the Supreme Court in New Jersey v. New York II, supra, the rights of these Pennsylvania plaintiffs were adjudicated with those of the Commonwealth of Pennsylvania barring recovery by them here.
 
 
 17
 We cannot agree with the district court's conclusions. A careful analysis of the nature of Parens patriae suits between states in original proceedings before the Supreme Court convinces us that, as a party to the proceeding, Pennsylvania represented all of its citizens, United States v. Nevada, 412 U.S. 534, 539, 93 S.Ct. 2763, 37 L.Ed.2d 132 (1973); Hinderlider v. La Plata Co., 304 U.S. 92, 106, 58 S.Ct. 803, 82 L.Ed. 1202 (1938); Wyoming v. Colorado, 286 U.S. 494, 506-507, 52 S.Ct. 621, 76 L.Ed. 1245 (1932); Kentucky v. Indiana, 281 U.S. 163, 173, 27 S.Ct. 655, 51 L.Ed. 956 (1930); Kansas v. Colorado, 206 U.S. 46, 99, 27 S.Ct. 655, 51 L.Ed. 956 (1907), and that the terms of the decree are thus conclusive upon all Pennsylvania citizens and bind their rights.
 
 
 18
 The Supreme Court has rejected reasoning similar to that relied upon by the district court.[2] In Wyoming v. Colorado, supra, the State of Wyoming brought a suit against the State of Colorado to enforce a decree of the Court rendered in an earlier suit between the same states dealing with their relative rights to divert and use for irrigation the waters of the Laramie River. There the Court stated:
 
 
 19
 But it is said that water claims other than the tunnel appropriation could not be, and were not, affected by the decree, because the claimants were not parties to the suit or represented therein. In this the nature of the suit is misconceived. It was one between states, each acting as a quasi sovereign and representative of the interests and rights of her people in a controversy with the other. Counsel for Colorado insisted in their brief in that suit that the controversy was "not between private parties" but "between the two sovereignties of Wyoming and Colorado"; and this court in its opinion assented to that view, but observed that the controversy was one of immediate and deep concern to both states and that the interests of each were indissolubly linked with those of her appropriators. 259 U.S. (419) 468, 42 S.Ct. 552, 66 L.Ed. 999. Decisions in other cases also warrant the conclusion that the water claimants in Colorado, and those in Wyoming, were represented by their respective states and are bound by the decree.
 
 
 20
 286 U.S. at 508-509, 52 S.Ct. at 627 (footnote omitted).
 
 
 21
 It is indeed true that the standing of states to bring Parens patriae actions on behalf of their citizens is limited by the Eleventh Amendment's prohibition against suits by citizens of one state against another state. Thus a state acting Parens patriae may not invoke the Supreme Court's original jurisdiction to protect the individual rights of its citizens. Pennsylvania v. New Jersey, 426 U.S. 660, 665-666, 96 S.Ct. 2333, 49 L.Ed.2d 124 (1976); Hawaii v. Standard Oil Co. of California, 405 U.S. 251, 258-259, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972); Oklahoma v. Atchison, T. & S. F. Ry.,220 U.S. 277, 31 S.Ct. 434, 55 L.Ed. 465 (1911); Kansas v. Colorado,supra, 206 U.S. at 98-99, 27 S.Ct. 655; Louisiana v. Texas, 176 U.S. 1, 20 S.Ct. 251, 44 L.Ed. 347 (1900); New Hampshire v. Louisiana, New York v. Louisiana (companion cases), 108 U.S. 76, 2 S.Ct. 176, 27 L.Ed. 656 (1883); Pennsylvania v. National Ass'n of Flood Insurers, 520 F.2d 11 (3d Cir. 1975). Nor may a state sue to recover damages on behalf of its individual citizens. North Dakota v. Minnesota, 263 U.S. 365, 375-376, 44 S.Ct. 138, 68 L.Ed. 342 (1923). Rather, a suit may be brought by a state "for an injury to it in its capacity of Quasi -sovereign. In that capacity the State has an interest independent of and behind the titles of its citizens, in all the earth and air within its domain." Georgia v. Tennessee Copper Co., 206 U.S. 230, 237, 27 S.Ct. 618, 619, 51 L.Ed. 1038 (1907).
 
 
 22
 Thus, appellees are correct in asserting that Pennsylvania could not have brought suit or intervened in the suit against New York to protect a mere collectivity of private riparian rights. But to draw from this the conclusion that the individual interests of Pennsylvania's riparian owners were not represented in the suit and are thus not affected by the Decree is to ignore the obvious fact that the riparian rights of the appellees are not independent of Pennsylvania's rights in the waters of the Delaware River but rather are derivative therefrom and are subject to change by the laws of that state. Connecticut v. Massachusetts, 282 U.S. 660, 670, 51 S.Ct. 286, 75 L.Ed. 602 (1931). Thus, it necessarily follows that the rights of Pennsylvania citizens cannot exceed those of Pennsylvania itself[3] and the extent of Pennsylvania's rights in the Delaware River was conclusively determined by the terms of the Decree.
 
 
 23
 Appellees maintain that the Supreme Court Decrees and Compact provisions cannot be interpreted in such a way as to divest them of their riparian rights to the full natural flow of the Delaware River without just compensation. The fact is, however, that Pennsylvania never had a right to an undiminished flow of the Delaware River. As the Supreme Court made clear in its opinion in 1931:
 
 
 24
 A river is more than an amenity, it is a treasure. It offers a necessity of life that must be rationed among those who have power over it. New York has the physical power to cut off all the water within its jurisdiction. But clearly the exercise of such a power to the destruction of the interest of lower States could not be tolerated. And on the other hand equally little could New Jersey be permitted to require New York to give up its power altogether in order that the river might come down to it undiminished. Both States have real and substantial interests in the River that must be reconciled as best as they may be.
 
 
 25
 283 U.S. 336, at 342-343, 51 S.Ct. 478, at 479, 75 L.Ed. 1104 (emphasis added).
 
 
 26
 It is manifest that a state cannot grant to private parties any privatelyowned property interest in riparian rights greater than the state's own property interest in them.[4] In Hinderlider v. La Plata Co.,supra, a Colorado company claimed that an interstate compact allocating the waters of the La Plata River denied its right to appropriate the water under an earlier decree of a Colorado court, thereby depriving it of its property without just compensation. The Supreme Court rejected this claim, explaining:
 
 
 27
 It may be assumed that the right adjudicated by the decree (of the Colorado court) to the Ditch Company is a property right, indefeasible so far as concerns the State of Colorado, its citizens, and any other person claiming water rights there. But the Colorado decree could not confer upon the Ditch Company rights in excess of Colorado's share of the water of the stream; and its share was only an equitable portion thereof.
 
 
 28
 304 U.S. at 102, 58 S.Ct. at 807.
 
 
 29
 Appellees attempt to avoid the clear applicability of Hinderlider to the present case by arguing that while the Supreme Court decree may preclude them from seeking equitable relief in order to obtain water in excess of their State's share of the river waters, as was sought by the Ditch Company in Hinderlider, the decree does not affect their right to damages for a diminished flow. We do not agree, for so to hold would hobble or possibly even destroy the effect of Supreme Court decrees or Congressionally approved interstate water compacts by subjecting those who rely upon the provisions of the decrees or interstate compacts to unreasonable damage burdens. What the Supreme Court decreed would be rendered nugatory by damage awards to private owners, a result inherently inconsistent with the supremacy of the Supreme Court's decree of equitable apportionment. Accordingly, we reverse the lower court's holding that New York City's diversion of waters, diversion done pursuant to the terms of the 1954 Supreme Court decree, was an actionable wrong which could form the basis for damages.
 
 
 30
 This does not end our discussion, however, for the district court further held that
 
 
 31
 (e)ven if we accept for the sake of argument the contention that Pennsylvania riparians on the Delaware are presently enjoying the full volume of water to which they were ever entitled, the fact remains that the City by its dams has materially altered and worsened the remaining waters of the Delaware, that is, has worsened the portions allotted, under the City's arguments, to Pennsylvania, New Jersey and Delaware. . . . (T)he City's works have adversely affected the temperature, flow, stage and quality of the River. The Supreme Court's Decrees were certainly not intended as licenses for the City to commit such injuries without liability.
 
 
 32
 450 F.Supp. at 867.
 
 
 33
 In order to comprehend more fully the effects that the City's diversions and compensatory releases have had upon plaintiffs' riparian properties, it is necessary to describe in greater detail the location of the City's dams in relation to plaintiffs' properties and the manner in which the Montague Formula, as set forth in the 1954 Decree, is being met.
 
 
 34
 Pursuant to the 1931 Decree and the 1954 Amended Decree, New York City constructed three dams. The first to be built was that on the Neversink River, a tributary of the Delaware River, entering the Delaware River at Port Jervis, N. Y., a point approximately 67 miles below the confluence of the East and West Branches of the Delaware River at Hancock and about 8 miles above Montague. Impoundment of the waters of the Neversink River by the City began in 1953. The second dam to be constructed was the Pepacton Dam on the East Branch of the Delaware River, impoundment beginning there in 1954. The third dam was the Cannonsville Dam on the West Branch of the Delaware River, impoundment commencing in 1963.
 
 
 35
 The Elwood (Van Loan) parcel is the only one of plaintiffs' parcels located above the confluence of the East and West Branches, it being situated on the West Branch 13.5 miles downstream from the Cannonsville Dam. The remaining four parcels are on the mainstream, ranging from six to thirty miles downstream from Hancock.
 
 
 36
 There is no requirement in the Amended Decree identifying the sources of the mandated minimum flow at Montague. Uncontradicted testimony at trial showed that the River Master (charged with enforcement of the Decree) has relied increasingly over the years on power plant releases on the Mongaup and Lackawaxen Rivers to make up the required flow at Montague. However, these power plant releases are not subject to the River Master's control and fluctuate greatly in the amounts of water released from time to time. Moreover, when the River Master does call upon the City for releases to supplement the flow at Montague, the City has the discretion to release the water called for from any one or from all three of its reservoirs. Inasmuch as the power company releases and the Neversink Dam releases enter the Delaware River upstream of Montague but downstream from plaintiffs' properties, the flow of water past plaintiffs' premises on any given day is not directly assured by the provisions of the decree. Thus, while it is possible for the releases called for to maintain the Montague Formula to be fulfilled totally by the power plant releases, records indicate that the City has, in the past, made releases from the Cannonsville Reservoir which have approximated one billion gallons of water per day. 450 F.Supp. at 859. Thus, the district court found that there were substantial fluctuations on a daily basis in the flow of water as it passed by appellees' premises. The court also found that, inasmuch as the City's dams were constructed in such a way as to release water from the Bottom of the dams, where the water temperature averages 40o Fahrenheit year-round, unaffected by air temperature, the river temperature in the summer in front of plaintiff's properties fluctuated between the upper 50's and the 70's, rendering the river suitable as neither a warm-water fishery nor a cold-water fishery. Also, it further found that the fluctuations in volume, stage, flow and temperature of the river, produced by the City's meeting the Montague Formula, had adverse effects on swimming, boating, and the general ecology of the river, and, in particular, it noted the growth of slime, algae and mosquitoes along the river. Id. at 870-871.
 
 
 37
 The rights of appellees to collect damages for the City's acts relative to the waters of the Delaware River, as described above, depend upon the scope of rights granted to the City under the terms of the Decree and Compact. For, as we determined above, the rights of these Pennsylvania citizens are no greater than those of Pennsylvania, and they may not exceed Pennsylvania's rights to the extent that they interfere with the rights granted to the City under the terms of the Decree and Compact by placing an onerous price upon the exercise of those rights.
 
 
 38
 The question then becomes one of interpretation as to the scope of the rights granted to the City under the terms of the 1954 Decree and Compact. Put simply, New York City was given the right to divert 800 m.g.d. subject to certain conditions of river management. One must query whether these conditions were meant to be exclusive, specifically leaving to the City the right to exercise its discretion in choosing the means by which to meet these conditions of river management. Or did the Court merely establish a very general release scheme, setting forth only minimum standards of river regulation without intending to address specifically issues relative to the impact that the operation of such a general release scheme might have upon the various downstream riparian interests?
 
 
 39
 An analysis of the proceedings before the Special Masters and of the terms of the 1931 and 1954 Decrees convinces us that the Court intended to establish a comprehensive scheme of river regulation, all-inclusive as to all matters concerning the manipulation of the flow of the undiverted portions of the waters of the Delaware River. In arriving at the terms of the Decrees the Special Masters took into consideration numerous and varied factors, indicating distinctly "the nature of the problem of apportionment and the delicate adjustment of interests which must be made." Illinois v. City of Milwaukee, 406 U.S. 91, 106, 92 S.Ct. 1385, 1394, 31 L.Ed.2d 712 (1972), (quoting Nebraska v. Wyoming, supra, 325 U.S. at 618). Evidence taken in the proceedings covered not only considerations of municipal water supply needs but also those of ecology, sanitation, fisheries, and recreation on and along the undiverted river waters.
 
 
 40
 Appellees maintain that their rights to the recreational value of the river properties could not have been and were not advanced in the proceedings before the Supreme Court. However, recreational interests, and the possibility that such interests would be harmed by the proposed diversion and release schemes, were advanced by the State of New Jersey on behalf of its citizens. And, indeed, such considerations played a major role in the Court's rejection of the New York plan of release, a reduction of the City's original request in 1931 for diversion of 600 m.g.d. to an allowed diversion of only 440 m.g.d. and in the requirement of sewage treatment.[5] Moreover, to the extent that their properties were located across the river from those of the New Jersey riparian landowners, the interests of downstream Pennsylvania riparians in the recreational uses of the river were necessarily considered along with those of the New Jersey property owners.[6] That the recreational interests of Pennsylvania riparians, such as appellees, whose lands were farther upstream, were not stressed in either the 1931 or 1954 proceedings is due in large measure to Pennsylvania's emphasis in both proceedings upon the industrial and water supply needs of Philadelphia and southeastern Pennsylvania. This overriding concern of Pennsylvania was evident at several stages of the proceedings before the Court.
 
 
 41
 In the 1931 proceeding evidence presented by Pennsylvania pertained primarily to proof that no substantial damage would be caused by the New York diversion taken pursuant to the Pennsylvania plan of impounding and release, a plan which was ultimately adopted by the Special Master as a better plan than that proposed by New York. The New York plan of release guaranteed only that there would be a total flow of 275 c.f.s. during every day of July, August, September and October immediately below the point of storage and that there would be a similar flow of 275 c.f.s. below the point of storage on every day during the remaining eight months when the water yield of the diversion area was less than 275 c.f.s.[7] Thus it appears that the New York plan of release proposed in 1931 would not have resulted in the sort of drastic fluctuation in flow, stage and temperature during the summer months which appellees now find to be so objectionable. It appears, however, that appellees' sovereign, Pennsylvania, made the policy decision to oppose this plan in favor of one providing for a greater stabilization of downstream river conditions.
 
 
 42
 In the 1954 proceedings Pennsylvania conceded that "no present injury will be done to it if New York builds the Cannonsville Reservoir, diverts 800 m.g.d. and releases water according to the Montague Formula." Indeed, the Commonwealth of Pennsylvania explicitly recognized the beneficial value of the Montague Formula to its citizens in its memorandum of December 7, 1976, presented to the District Court in response to that Court's request that the parties in the original action state their position with regard to New York Environmental Conservation Law §§ 15-0801(1), 15-0805(2) enacted in July 1976 (1976 N.Y.Laws ch. 888). This Conservation Law represented an attempt by the New York legislature to ameliorate the detrimental impact of New York City's release regime upon recreational uses of the Delaware River and its tributaries below the dams. In its memorandum, Pennsylvania opposed any new release regime that would in any way threaten the City's ability to meet the Montague Formula in periods of drought, stating that the
 
 
 43
 (m)aintenance of the Montague Formula flows is vital for the protection of downstream municipal industrial, recreational, fishery and other uses. It is not simply a legal requirement but a physical necessity. During drought conditions, the releases provided under the Formula are crucial in assuring water supplies to southeastern Pennsylvania and southern New Jersey. Without adequate flow, saline intrusion migrates up the River from the estuary threatening both Philadelphia and Camden public water systems.
 
 
 44
 When one considers the cost to New York City of meeting the requirement of the Montague plan, it becomes apparent that Pennsylvania was indeed successful in demanding and securing for its citizens costly compensating benefits in exchange for the City's diversions. For instance, under the terms of the Decrees, the City is required to devote approximately 32% Of the storage capacity of its three dams to assure adequate flows at Montague during dry or low-stage periods of the river, resulting in a 250% Increase in the observed minimum flow of the river.[8] As counsel for appellant asserts without contradiction, the City's expenditure for that additional storage capacity alone cost it approximately $30 million.[9] In light of the City's costly disbursements for the benefit of the lower basin states, it hardly would appear equitable to require a supplemental outlay for the payment of damages to riparian landowners such as appellees.
 
 
 45
 That appellees do not receive the same benefits of stabilization in the stage and flow of the river as do downstream Pennsylvania riparians is simply a matter of intramural dispute over the distribution of water within the Commonwealth. Appellees cannot be allowed to collaterally attack, in this suit against New York City, the wisdom of the policy choices made by their sovereign in the representation of all of its citizens acting in its capacity of Parens patriae.
 
 
 46
 In denying the City of Philadelphia's motion to intervene in the 1954 proceedings, the Court stated that
 
 
 47
 the state, when a party to a suit involving a matter of sovereign interest, "must be deemed to represent all of its citizens." Kentucky v. Indiana, 281 U.S. 163, 173-174, 50 S.Ct. 275, 74 L.Ed. 784 (1930). The principle is a necessary recognition of sovereign dignity, as well as a working rule for good judicial administration. Otherwise, a state might be judicially impeached on matters of policy by its own subjects, and there would be no practical limitation on the number of citizens, as such, who would be entitled to be made parties.
 
 
 48
 New Jersey v. New York III, 345 U.S. 369, 372-373, 73 S.Ct. 689, 691, 97 L.Ed. 1081.
 
 
 49
 Appellees cannot recover from New York City for what their own sovereign has ceded in their behalf. Their rights of recovery, if any, lie against Pennsylvania. In both the 1931 and the 1954 proceedings before the Supreme Court, Pennsylvania did not oppose the diversions by the City provided the water was taken pursuant to the plans of impoundment and release which were in fact ultimately adopted by the Court. Moreover, in 1961, Pennsylvania entered into the Delaware River Basin Compact, the provisions of which deny the DRBC the power to
 
 
 50
 (e)xercise any jurisdiction, except upon consent of all the parties (to the 1954 Supreme Court Decree) over the planning, design, construction, operation or control of any projects, structures or facilities constructed or used in connection with withdrawals, diversions and releases of waters of the basin authorized by said decree or of the withdrawals, diversions or releases thereunder.
 
 
 51
 Delaware River Basin Compact § 3.5(c).
 
 
 52
 The provisions of the compact further forbid the DRBC to "(i)mpose or collect any fee, charge or assessment with respect to diversions of waters of the basin permitted by said decree." Id. § 3.5(b).
 
 
 53
 To grant appellees damages for injuries to their riparian properties which arise from the City's meeting of the Montague Formula would amount to a total circumvention of these Compact provisions and would accomplish what would otherwise require the unanimous consent of all parties to the Decree.[10] The 1954 Decree specifically allows the City to maintain the required flow at Montague by releasing water from "One or more of its storage reservoirs in the upper Delaware watershed." New Jersey v. New York IV, supra, 347 U.S. at 997, 74 S.Ct. at 843 (emphasis added). Thus the City is within its rights in choosing to meet the calls by the Special Master for additional water to maintain the flow at Montague by, for instance, releases entirely from the Cannonsville Reservoir.
 
 
 54
 The Decree does not address itself to the location on the dams to be constructed by the City of the apertures thereon from which impounded water is to be discharged, nor address itself to possible fluctuations in temperature which could result from placement of the apertures at the bottom of the dams. No party to the Decree raised this issue in the course of the proceedings before the Special Master. Indeed, it would appear that if the impoundment and release procedure does produce injurious fluctuations in water temperature, such an occurrence would be the sort of "unforeseen particular"[11] in anticipation of which the Court retained jurisdiction to allow for further modifications of the terms of its Decree. However, by 1961 both the Neversink and Pepacton Dams had been completed; none of the parties to the Decree had applied for modification of its terms; and all the parties to the Decree had entered into the Delaware River Basin Compact, whose provisions further clarify the circumstances under which the parties to the Decree may apply to the United States Supreme Court for a modification of the terms of the Decree.
 
 
 55
 Curiously, appellees have placed great reliance upon the following language in the Compact: "Nothing contained in this compact shall be construed as affecting or intending to affect or in any way to interfere with the law of the respective signatory parties relating to riparian rights." Delaware River Basin Compact, Art. 14, § 14.19. However, to interpret this provision as intending to allow for an award of damages for injury resulting from conduct clearly authorized by the terms of the 1954 Decree would put this section of the Compact in unreasonable conflict with several other sections thereof. See Delaware River Basin Compact, Art. 3, §§ 3.3(a), 3.5. Accordingly, we construe this provision to mean no more than that, within the limits of the Supreme Court Decree, the private riparian owners may enforce riparian rights against anyone who violates them.
 
 
 56
 In short, appellees here have no direct means of obtaining the relief they request from appellant City for the injuries they complain of. If a remedy directed at moderating these variations in water temperature is now indicated, that remedy must now lie either in an application to the United States Supreme Court by a party to the Decree for a modification of its terms or in an application to the DRBC by a signatory state to the Delaware River Basin Compact for a similar modification to the terms of the Compact, which application can only be entertained upon the unanimous consent of all of the parties to the Decree.
 
 
 57
 The judgments below are reversed.
 
 
 
 [1]
 In the course of this opinion, reference will be made to various stages of the litigation concerning the equitable apportionment of the waters of the Delaware River by the United States Supreme Court. Because the same parties were involved at each stage, a Roman numeral suffix has been appended to the official citation to differentiate the separate stages. It should be noted that the separate stages, as set forth in the list below, follow a chronological order, rather than the order of their appearance in this opinion
 New Jersey v. New York I, 280 U.S. 528, 50 S.Ct. 151, 74 L.Ed. 595 (1930)
 New Jersey v. New York II, 283 U.S. 805, 51 S.Ct. 645, 75 L.Ed. 1425 (1931)
 New Jersey v. New York III, 345 U.S. 369, 73 S.Ct. 689, 97 L.Ed. 1081 (1953)
 New Jersey v. New York IV, 347 U.S. 995, 74 S.Ct. 842, 98 L.Ed. 1127 (1954).
 
 
 [2]
 See Nebraska v. Wyoming, 295 U.S. 40, 43, 55 S.Ct. 568, 569, 79 L.Ed. 1289 (1935), where the Court rejected the notion that the U.S. Secretary of the Interior was a necessary party to original proceedings before the Court to apportion the waters of the North Platte River. Inasmuch as the position of the Secretary of the Interior is that of an appropriator of water for storage under the laws of Wyoming, the Court reasoned that "(h)is rights can rise no higher than those of Wyoming, and an adjudication of the defendant's rights will necessarily bind him. Wyoming will stand in judgment for him as for any other appropriator in that state."
 
 
 [3]
 The Supreme Court early established that a state cannot grant to private parties title to Land which is later determined by interstate compact or Supreme Court decree to be beyond the true boundaries of the state. Rhode Island v. Massachusetts, 37 U.S. (12 Pet.) 657, 9 L.Ed. 1233 (1838); Poole v. Lessee of Fleeger, 36 U.S. (11 Pet.) 185, 9 L.Ed. 680 (1837). The Court made clear that such determinations by compact or decree affect the private property rights of the citizens of a state as well as those matters which pertain to a state's sovereignty over the land within the boundaries of the state. "Title, jurisdiction, sovereignty, are, therefore, dependent questions, necessarily settled, when the boundary is ascertained, which, being the line of territory, is the line of power over it." Rhode Island v. Massachusetts, supra, 37 U.S. at 733. In Poole v. Lessee of Fleeger, supra, the Court held that the fixing of the boundary does not result in a "divestiture" of citizens' titles to lands which were derived from grants under the state. Rather, the citizens' titles are invalid, Ab initio, due to "an intrinsic defect of title in the states." 36 U.S. at 210
 
 
 [4]
 See footnote 3, Supra ; and we also reject the district court's reliance upon the following language in the Supreme Court's 1954 Decree in New Jersey v. New York IV, supra, to support its conclusion that the Supreme Court did not "Directly rule on the effect of its Decrees on individual riparian owners." 450 Supp. at 865. "No diversion herein allowed shall constitute a prior appropriation of the waters of the Delaware River or confer any superiority of right upon any party hereto in respect of the use of those waters." 347 U.S. at 1004, 74 S.Ct. at 846. To our mind, this language reflects merely that the Court did not intend to establish any permanent "superiority of right" in any party because that party at the time of apportionment under the 1954 Decree was granted rights in the water apportioned by the Decree. Rather, said apportionment was meant to be subject to future modifications due to changes in circumstances affecting the equities of the apportionment. See Nebraska v. Wyoming, 325 U.S. 589, 622-623, 65 S.Ct. 1332, 89 L.Ed. 1815 (1945.) This interpretation is borne out in part by the words of Special Master Burch in his Report to the Supreme Court in 1931 wherein he identified this language as Not pertaining to the rights of the Delaware River Basin States: "I do not think that the mere fact that the State and City of New York are first in point of time in taking waters from the tributaries of the Delaware River gives any superiority of right. While the doctrine of priority of appropriation is applied in some of the arid states of the west and is part of the public policy of such states, I find no such principle obtaining in New York, New Jersey, or Pennsylvania," at 191
 
 
 [5]
 See page 146 of the Report of Special Master Charles N. Burch to the U. S. Supreme Court in the proceedings of New Jersey v. New York II (1931)
 
 
 [6]
 On page 140 of his Report, Special Master Burch said with reference to the recreational value of Pennsylvania riparian lands: "In this connection it should be remembered that the State of Pennsylvania, on the opposite bank of the Delaware River from New Jersey, is just as much interested in any damage to the Delaware River as the State of New Jersey and, if any damage is sustained, those damages will be borne by Pennsylvania to the same extent as New Jersey, with the exception of damage to oyster beds. . . . The pleasure and recreational activities and developments appear to be greater on the Pennsylvania shore than on the New Jersey shore."
 
 
 [7]
 See Report of Special Master Burch at 55
 
 
 [8]
 See page 82 of the Report of the Special Master Kurt F. Pantzer to the U. S. Supreme Court in the proceedings of New Jersey v. New York IV
 
 
 [9]
 Appellant's Brief, p. 15
 
 
 [10]
 Appellees cannot be permitted to mount such a collateral attack seeking personal damages. For, as the Supreme Court stated in Georgia v. Tennessee Copper Co., 206 U.S. 230, 239, 27 S.Ct. 618, 620, 51 L.Ed. 1038 (1907), whether a state "by insisting upon (its claim in its capacity as quasi-sovereign) is doing more harm than good to her own citizens is for her to determine."
 See also City of Tacoma v. Taxpayers of Tacoma, 357 U.S. 320, 340-341, 78 S.Ct. 1209, 2 L.Ed.2d 1345 (1958) (citations omitted):
 The final judgment of the Court of Appeals was effective, not only against the State, but also against its citizens, including the taxpayers of Tacoma, for they, in their common public rights as citizens of the State, were represented by the State in those proceedings, and, like it, were bound by the judgment.
 
 
 [11]
 New Jersey v. New York II, supra, 283 U.S. at 344, 51 S.Ct. 478. See also, page 207 of the Report of Special Master Burch, note 5 Supra, wherein he recommended that the Pennsylvania plan of release be approved, "subject to such modifications as actual tests and experience may indicate, and without prejudice to any party to this case to apply for modification."